STATE of Minnesota, Respondent,

v.

Keith HENDERSON, Appellant.

No. C4–99–1276.

Supreme Court of Minnesota.

Jan. 11, 2001.

John M. Stuart, State Public Defender, Lawrence Hammerling, Jodie L. Carlson, Asst. State Public Defenders, Minneapolis, MN, for appellant.

Mike Hatch, Attorney General, St. Paul, MN, Amy Klobuchar, Hennepin County Attorney, Paul R. Scoggin, Asst. County Attorney, Minneapolis, MN, for respondent.

## OPINION

LANCASTER, Justice.

A jury found appellant Keith Henderson guilty of first-degree murder in violation of Minn.Stat. § 609.185(1) (2000), and guilty of a crime committed for the benefit of a gang in violation of Minn.Stat. § 609.229, subds. 1 and 2 (2000), in connection with the shooting death of Juwan Gatlin. The district court sentenced Henderson to life in prison on the first-degree murder conviction and imposed a consecutive five-year sentence for conviction of a crime committed for the benefit of a gang. Henderson appeals his convictions and requests a new trial on several grounds. First, he argues that the cumulative effect of numerous evidentiary rulings and prosecutorial misconduct violated his constitutional right to a fair trial. Second, Henderson complains that the prosecutor's use of a peremptory challenge to strike a juror was racially motivated and thus violated the Equal Protection Clause of the United States Constitution pursuant to the rule in *Batson v. Kentucky*, 476 U.S. 79, 86, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Third, he argues that evidence presented at trial was insuf-

ficient to support his convictions. Finally, he contends that his sentence of life plus a term of years violates Minn.Stat. §§ 609.095 and 609.10 (2000). We affirm Henderson's convictions and sentence.

Juwan Gatlin was shot to death at approximately 11:00 a.m. on August 7, 1998, in an alley near Logan Avenue in Minneapolis. He was shot between 13 and 15 times with a .40 caliber Smith and Wesson handgun. The handgun was never recovered.

Gatlin, like Henderson, was a member of a street gang called the Mickey Cobras. Gatlin was murdered because he provided the police with information about the unsolved murder of Anthony Dawson. Because of the information Gatlin provided to police, the two individuals who had been arrested for Dawson's murder were released and the police arrested Arthur Hurd and Mitchell Douglas, also members of the Mickey Cobras.[1] In exchange for the information, Gatlin entered into a plea agreement on an unrelated robbery charge whereby he received a probationary sentence on what otherwise would have been a prison sentence. Both Hurd and Douglas pleaded guilty to the murder of Anthony Dawson.

About six weeks before Gatlin's death, while Hurd was in the Carver County Jail on the Dawson murder charge, he mailed a copy of Gatlin's police statement to Andrew Neal. Attached to the statement was a letter from Hurd indicating that "something needs to be taken care of." Shortly thereafter Neal gave the statement to Donald Carter. Fellow members of the Mickey Cobras referred to Carter as the "don of dons." Carter had the authority, within the organizational structure of the gang, to order a "hit" on another Mickey Cobra. According to the internal rules of the Mickey Cobras, providing information to police about a fellow Mickey Cobra is considered "probable cause" for a "hit" in retaliation for betraying the gang.

In August 1998, April Bell (Bell) lived in a house in Minneapolis with her mother Melanie Bell. Bell was a member of the Mickey Cobras. The Bell residence was one block from where Gatlin's body was found, and Bell testified at Henderson's trial.

On the morning of August 7, 1998, at around 11:00 a.m., Bell was home taking a shower when she heard Darryl McKee call her name. McKee was a Mickey Cobra. Bell got out of the shower and went into her room. McKee asked Bell where she hid a duffel bag of guns that he had brought to her house about a week before. Bell said the duffel bag was in her closet. When she asked McKee why he wanted the guns, McKee responded that "[w]e fixin' to smoke [Gatlin]." McKee told Bell that Gatlin was waiting downstairs. McKee then retrieved the duffel bag from the closet. In the bag there were two Uzis[2] and an automatic silver and black handgun. While McKee loaded the handgun with bullets from the bag, Donte Evans, another Mickey Cobra, joined McKee in Bell's room. McKee told Evans that Evans and Henderson were to go outside and walk with Gatlin and then McKee would shoot Gatlin. Bell asked McKee why they were going to kill Gatlin, and McKee responded that it was because Gatlin had been "snitching." Bell did not see Henderson before the shooting.

Approximately five minutes later, McKee and Evans returned to the Bell residence with Henderson; they were very excited. McKee changed into clothes he had previously stored at the Bell house and put the handgun back in the same duffel bag with the two Uzis. Evans removed one of the two shirts he had been

---

1. In the course of robbing a "weed house" ("weed house" is slang for a house where marijuana is sold), Hurd and Douglas shot and killed Anthony Dawson when he tried to run from the robbery. They also shot and wounded a fleeing woman carrying a baby.

2. "Uzi" is a brand name for a manufacturer of semi-automatic submachine guns.

wearing. Henderson did not change his clothes. Bell had a doctor's appointment and McKee insisted, over Bell's objection, that the three men would accompany her. The four of them left Bell's house at approximately 11:45 a.m. Bell testified that, while they were in the car, McKee stated that after Gatlin was shot he said "I'm already dead, T." [3] Bell stated that McKee told her that he responded, "you ain't dead, you just trying to talk yourself out of being dead."

The group ate lunch and then went to Bell's 1:25 p.m. doctor's appointment, after which McKee directed her to drive by the alley to see if Gatlin's body had been discovered. They could see that the alley was the scene of a homicide investigation. Bell then dropped off Evans and Henderson, and McKee and Bell returned to the Bell residence. About 30 minutes later, McKee and Bell went to Carter's residence. Bell testified that McKee said to Carter words to the effect "[g]uess what we just did." McKee and Carter then had a private conversation, and Bell left the Carter residence without McKee. Upon returning to her house, Bell moved the bag of guns from her bedroom to a basement closet. McKee returned to the Bell residence later that evening with a copy of Gatlin's statement to the police regarding the Dawson murder. McKee told Bell to put the statement in the bag with his clothes. McKee came back the next day to pick up his clothes and told Bell he was going to Chicago. The same day McKee retrieved the clothes, Carter came by the Bell residence and retrieved the two Uzis and the duffel bag from the basement. He left the silver and black automatic handgun behind. Evans fled Minnesota after the murder of Gatlin and was killed in Chicago.

During the investigation of Gatlin's murder, two homicide detectives stopped by Bell's house to question her about the murder. Bell told the detectives that she knew nothing about it. After the police

left, Bell told her mother everything she knew about Gatlin's murder.

Later that same day, Henderson went to see Bell and she told him that he had to get the automatic handgun out of her house. In discussing the impending investigation, Henderson told Bell he would say he was with someone else when the murder occurred, and told Bell to tell the detectives that she did not know anything. Henderson told her that he would be back the next day to retrieve the handgun. The following day Henderson returned to the Bell residence. Bell was not at home but Melanie Bell told Henderson that she knew he had come for the gun and that he was to go to the basement to retrieve it. Henderson wanted to come back when Bell was home, but Melanie Bell ordered Henderson to get the gun out of her house immediately. Henderson had difficulty locating the gun and Melanie Bell helped him find it. Melanie Bell watched as Henderson put socks on his hands before touching the gun and then put the gun in his pants.

As a result of the investigation, Evans, McKee, and Henderson were indicted for the murder of Juwan Gatlin. During voir dire, the prosecutor used a peremptory strike to strike an African–American woman from the jury. Henderson's attorney challenged the strike under *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The district court rejected the challenge.

At trial Herbert Williams, a member of the Mickey Cobras, testified to a conversation he had with Evans regarding Evans' participation in the Gatlin murder. According to Williams, Evans told him, "T, we got away with it * * * we got [Gatlin], we got [Gatlin]." Evans described to Williams how he, Henderson, and McKee went to the back of Bell's house, that Henderson pulled out the gun and shot Gatlin and then passed the gun to him (Evans). Evans told Williams that Gatlin,

---

**3.** "T" is slang that the Mickey Cobras use to refer to fellow gang members.

still alive, said, "I'm dead, T, I'm dead." Evans then told Williams that he shot Gatlin five times in the head.

Dedra Johnson, a former girlfriend of Gatlin and a neighbor of Henderson, testified that Henderson told her, "I did.it" in reference to Gatlin's murder, but after seeing the shock on Johnson's face, Henderson told her he was joking. Johnson testified before the grand jury that Henderson told her he shot Gatlin after pushing him in an alley. When Johnson recanted this testimony at trial, the court allowed the prosecution to admit Johnson's grand jury testimony as substantive evidence.

Cherry Bell, April Bell's cousin, testified that in a phone conversation Henderson told her to tell April Bell that she should tell police that Henderson was out of town at the time of the murder.

Paul Givens testified that while in jail with Henderson, Henderson told him that he pushed a guy over in an alley and shot him in the leg, arm, and head. Givens testified that Henderson told him the victim said, "[d]on't shoot me no more. I'm already dead." Although Givens had been declared incompetent to stand trial due to marginal intellectual capacity and dementia from severe head trauma, the district court found him competent to testify in Henderson's case.

The jury found Henderson guilty of first-degree murder and a crime for the benefit of a gang. Henderson filed a motion for a new trial, which was denied. Henderson was sentenced on count one, first-degree murder, to life in prison, and on count two, a crime committed for the benefit of a gang, to five years to be served consecutively.

In his appeal, Henderson asserts that he is entitled to a new trial on the following grounds: (1) the cumulative effect of erroneous evidentiary rulings and prosecutorial misconduct violated Henderson's constitutional right to a fair trial; (2) the prosecutor's use of a peremptory challenge to

strike an African–American juror was racially discriminatory under *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); and (3) the evidence presented at trial was insufficient to support a conviction on the charge of first-degree murder. He also argues that his sentence violated Minn.Stat. §§ 609.095 and 609.10.

I.

Henderson argues that he was deprived of his right to a fair trial due to the cumulative effect of numerous district court errors and acts of prosecutorial misconduct. Henderson alleges the following trial errors: The district court erroneously admitted evidence under Minn.R.Evid. 804(b)(3) in violation of the Confrontation Clause; the court erroneously excluded evidence that supported his alternative theory of the case; the court erred in refusing to give an instruction regarding accomplice testimony; and the court erred by failing to find that the prosecutor committed prosecutorial misconduct during the trial.

*Confrontation Clause Challenge*

Henderson asserts that his rights under the Confrontation Clause, U.S. Const. amends. 6 and 14, and Minn. Const. art. I, § 6, were violated when the district court permitted Herbert Williams to testify about the conversations he had with Donte Evans. According to Williams, Evans told Williams that he witnessed Henderson shoot Gatlin, then Evans took the gun from Henderson and fired five more shots into Gatlin.

The Sixth Amendment to the United States Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him * * *." The Minnesota Constitution affords the same fundamental right, and the analysis is the same under both provisions. *See* Minn. Const. art. I, § 6; *State v. Dukes,* 544 N.W.2d 13, 19 (Minn.1996). Henderson argues that only those statements that directly

inculpated Evans should have been admitted, and that Evans' statements regarding what was done with the gun moments before he shot Gatlin should have been redacted. We begin by examining the content of Evans' statements, as testified to by Williams, and the context in which Evans' statements were made.

Williams identified other gang members and their ranks within the organization. Williams testified that on or shortly after the day of the murder Williams was driving a car in which Evans was a front-seat passenger. Williams' cousin was riding in the back seat. Evans whispered in Williams' ear: "T, we got away with it." Nothing else was said on the subject until Williams and Evans were alone together in the hallway of Williams' apartment building. There, Evans elaborated. Williams testified that Evans said: "We got away with it, we got [Gatlin], we got [Gatlin]." Williams asked Evans: "What [are] you talking about?" Evans responded: "It was like me, Black [Henderson], DMC [Darryl McKee], QC, Rock [Donald Carter], Looney [Marvin Dancy]." Evans continued: "We told [Gatlin] that we was going to have emergency services."[4] Evans explained to Williams that the group went to Bell's house where, Evans said, McKee suggested that the group break Gatlin's neck, but they decided against it because of the difficulties of getting the body out of the house. The group left Bell's and proceeded to a weed house. Williams testified that Evans told him that Henderson shot Gatlin and then handed the gun to Evans. Evans, after he had the gun, spoke to Gatlin, who responded: "I'm dead T, I'm dead." Evans then shot Gatlin five times

in the head. Williams testified that Evans said he saw Gatlin's brains spilling onto the ground after he shot him, and that Evans reported that it made him feel good to shoot and kill Gatlin. Evans told Williams that the reason for killing Gatlin was "[t]hey got a motion of discovery. He was snitching on the brothers." The gist of Williams' testimony, then, was that Evans told him that the gang had decided to kill Gatlin for snitching, that Evans, Henderson, and several others plotted and executed the murder, and that although Henderson first shot Gatlin, Evans completed the murder, firing five more shots into Gatlin.

▪ Henderson claims the court erred in admitting Evans' entire statement as a statement against penal interest. Such evidentiary rulings generally rest within the discretion of the district court and will not be reversed absent a clear abuse of that discretion. *See State v. Glaze*, 452 N.W.2d 655, 660 (Minn.1990). Henderson bears the burden of showing that the challenged evidence was erroneously admitted or excluded. *See State v. Horning*, 535 N.W.2d 296, 298 (Minn. 1995). The court found that because the statements exposed Evans to liability for his participation in the murder, the statements Williams testified to fell under the "statement against penal interest" exception to the hearsay rule. *See* Minn.R.Evid. 804(b)(3).[5]

▪ The court next considered whether the introduction of Evans' statements violated Henderson's rights under the Confrontation Clause. A hearsay statement may be admitted into evidence

---

**4.** "Emergency services" is slang for a gang meeting, and Evans said the pretext for this meeting was the murder of another gang member named "Steezo."

**5.** Minnesota Rule of Evidence 804(b)(3) defines a statement against interest as:

A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or

criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

without violating the Confrontation Clause if the statement presented is both necessary and reliable. *See State v. Byers,* 570 N.W.2d 487, 493 (Minn.1997) (citing *Ohio v. Roberts,* 448 U.S. 56, 65, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980)). In this case, it is uncontested that Evans' out-of-court statements are necessary because he was dead and therefore unavailable. Thus, the issue in debate is whether the statements are reliable. A hearsay statement is reliable and therefore does not violate the Confrontation Clause if it falls within a "firmly rooted hearsay exception" or contains "particularized guarantees of trustworthiness." *Roberts,* 448 U.S. at 66, 100 S.Ct. 2531. A plurality of the United States Supreme Court recently held that "accomplice[ ] confessions that inculpate a criminal defendant" are not within a firmly rooted hearsay exception. *See Lilly v. Virginia,* 527 U.S. 116, 134, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999). As a result Evans' statements, as testified to by Williams, were only admissible if they possessed "particularized guarantees of trustworthiness."

■ A genuinely self-inculpatory statement has one of the particularized guarantees of trustworthiness that makes a statement admissible under the Confrontation Clause. *See Williamson v. United States,* 512 U.S. 594, 603, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994). To the extent that Evans' statement merely identified Henderson as having shot first, that statement did not directly inculpate Evans. As such, the general ban on non-self-inculpatory accomplice statements would render Williams' testimony inadmissible for Confrontation Clause purposes. *See Williamson,* 512 U.S. at 600, 114 S.Ct. 2431. However, Evans' statement that Henderson shot first, taken in context, arguably inculpates Evans because the shot was fired only after Evans and the other gang members formed a pretense to meet with Gatlin, decided on a method to kill him, and arrived at the desired location. Henderson's shot was a step in the pro-

gression of events for which Evans could have been held liable, regardless of Evans' direct participation in the shooting. *See* Minn.Stat. § 609.05 (2000) (describing liability for crimes of another). To that degree, Evans' statement is self-inculpatory, and meets the hearsay exception for statements against penal interest.

■ We need not decide whether the degree to which Evans' statement was self-inculpatory alone supports a finding of trustworthiness, however, because the totality of the circumstances surrounding the making of the statement supports the reliability of the statement. First, the district court found the statements about Henderson were reliable because the declarant was concerned about Williams' cousin overhearing him. In addition, in speaking with Williams, a fellow gang member, Evans had no motivation to shift blame to Henderson. Evans was not speaking to the police, nor was he in a situation where he would benefit from de-emphasizing his culpability in Gatlin's murder by inculpating Henderson. There is no evidence that would lead the district court to suspect coercion, ulterior motive, desire to win favor with authorities, or otherwise doubt Evans' motives. *Cf. Lilly,* 527 U.S. at 135–39, 119 S.Ct. 1887 (holding, by a plurality, that the specific facts of the case demonstrated that the statements in question were not inherently reliable because the defendant had a natural motive to lie in order to exculpate himself); *Lee v. Illinois,* 476 U.S. 530, 544, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986) (holding that the admission of a confession violated the Confrontation Clause, noting that the question to consider when determining the reliability of a statement is "whether the confession was * * * free from any desire, motive, or impulse [the declarant] may have had either to mitigate the appearance of his own culpability by spreading the blame or to overstate [the defendant's] involvement in retaliation for [the defendant] having implicated [the declarant] in the [crime]"). Therefore, we conclude that un-

der the totality of the circumstances surrounding Evans' statements to Williams, the statements possessed sufficient guarantees of trustworthiness so as to ensure their reliability. Accordingly, we hold that the admission of the statements did not violate Henderson's rights under the Confrontation Clauses of the state and federal constitutions.

*Wrongfully Excluded Evidence*

▬ Henderson next argues that the district court erred in denying him the opportunity to present evidence relevant to his theory of defense. Henderson's defense at trial was that he was not responsible for Gatlin's death and was not present at the scene. A criminal defendant must be treated with fundamental fairness and " 'afforded a meaningful opportunity to present a complete defense.' " *State v. Richards,* 495 N.W.2d 187, 191 (Minn.1992) (quoting *California v. Trombetta,* 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984)); *accord* U.S. Const.amend. XIV, § 1; Minn. Const. art. I, § 7. Nonetheless, criminal defendants are bound by the rules of evidence, which are designed to assure fairness and reliability in ascertaining guilt or innocence. *See State v. Tovar,* 605 N.W.2d 717, 722 (Minn.2000) (citing *Chambers v. Mississippi,* 410 U.S. 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973)). Thus, even when a defendant alleges that his inability to present a defense violates his constitutional rights, evidentiary questions are reviewed for abuse of discretion. *See State v. Gustafson,* 379 N.W.2d 81, 84 (Minn.1985).

First, Henderson sought to introduce evidence that, in an out-of-court identification shortly after the shooting, another African–American man was identified as one of the individuals running from the alley where Gatlin was murdered. A witness testified that she heard gunshots on August 7, 1998. She immediately looked out of her window and saw three men running from the scene of the shooting. That afternoon, the witness gave the police a description of the men. Approximately four hours after the shooting, the police stopped and detained a car with four African–American men who matched the description the witness gave. The witness was afraid to confront the suspects, so the police allowed her to sit in a car to look out of the window as she was driven by the detained men in order to see if she could identify any of them. After two passes, the witness identified one of the four men in the car as one of the men she had earlier seen running from the scene. Henderson, Evans, and McKee were not in the car.

At trial, under the past-recollection recorded exception to the hearsay rule (Minn.R.Evid. 803(5)), the witness was permitted to read aloud from her earlier police statement as to what the men looked like and what they were wearing. However, when she could not recall that she identified someone in the car, Henderson attempted to admit the identification through testimony of the police officers present. Minnesota Rule of Evidence 801(d)(1)(C) provides that a prior identification of a witness is hearsay unless the "declarant testifies at the trial * * * and is subject to cross-examination concerning the statement." Rule 801(d)(1)(C) only permits admission of a prior identification, however, if the district court "is satisfied that the circumstances of the prior identification demonstrate the reliability of the prior identification."

▬ The district court found that the identification was not admissible because the witness did not make a "statement" regarding the identification about which she could be cross-examined. The district court also found that the circumstances of the drive-by identification rendered it unreliable. The record supports the district court's finding of unreliability, as there is no evidence that the car in which the witness rode stopped to look at the detainees for any length of time, or that the witness got a good look at the detainees. The court's determination of unreliability

was not an abuse of discretion, and therefore we conclude that the exclusion of evidence of the out-of-court identification was not error.

■ Second, Henderson sought to introduce evidence from a forensic scientist that shell casings found at the scene of Gatlin's murder matched shell casings from a "home-invasion robbery" a few days prior to the killing. Henderson argued that this evidence would permit the inference that Gatlin had participated in that home invasion and that there may have been an alternative motive for his murder other than gang retaliation. The district court ruled that the evidence was not relevant to the case, noting that the evidence could suggest that Henderson was involved in both the killing and the home invasion.

■ Evidence is relevant when it "logically or reasonably tends to prove or disprove a material fact in issue, or tends to make such a fact more or less probable, or affords a basis for or supports a reasonable inference or presumption regarding the existence of a material fact." *State v. Horning*, 535 N.W.2d 296, 298 (Minn. 1995); Minn.R.Evid. 401. While a motive for this murder was a material fact, an alternative theory as to motive is not necessarily relevant when it does not make Henderson's involvement more or less probable. As such, the district court did not abuse its discretion in refusing to admit evidence of the shell casing from the home invasion.

■ Third, Henderson sought to introduce testimony from a police sergeant that although Gatlin feared that other gang members may harm him or his family because of his cooperation with the police on the Dawson murder, Gatlin was not specifically afraid of Henderson. The district court properly concluded that Gatlin's lack of fear of Henderson was not relevant to the case because Gatlin's specific fears had no bearing on whether it was more or less

likely that Henderson killed Gatlin. *See* Minn.R.Evid. 401.

■ Fourth, Henderson sought to introduce testimony that a police informant, Andrew Neal, was found in possession of a large quantity of cash and a handgun a few days after the Gatlin murder. Neal told police about conversations he and others had with Dedra Johnson about statements Henderson made to her. At the time of the murder Neal was on probation, the terms of which prohibited him from possessing firearms. The day after Gatlin's body was found, a search warrant was issued for Neal's residence. There, the police found a pistol in a bag with Neal's fingerprints on it and $2,000 in cash. Henderson's purpose in seeking to introduce that evidence was to demonstrate that because Neal would have to serve 90 months in jail if his probation was revoked, he had a motive to accuse Henderson in an effort to maintain his probationary status.

The district court refused to admit testimony regarding the gun and money at Neal's residence. The court reasoned that the gun recovered was not the murder weapon and the connection between the gun and money and Henderson's case was "so speculative and confusing that its prejudice exceeds any probative value." Otherwise admissible evidence should be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Minn.R.Evid. 403; *see also Tovar*, 605 N.W.2d at 724. Viewing the decision with the deference appropriate to district court evidentiary rulings, we conclude that the district court did not abuse its discretion in refusing to admit the testimony regarding the handgun and money discovered in Neal's apartment.

■ Finally, Henderson sought to admit testimony that he was no longer a member of the Mickey Cobras gang. The

district court admitted the physical evidence that Henderson had changed his signature tattoo of the Mickey Cobras, an indication that Henderson left or was leaving the gang. A witness also testified that she assumed the tattoo was removed so Henderson could get out of the gang. However, the court refused to permit two witnesses to testify about statements Henderson made to them as to why he changed the tattoo, and Henderson challenges this evidentiary ruling. The statements Henderson sought to admit were hearsay because they were made out of court and offered to establish the truth of their contents. *See* Minn.R.Evid. 801, 802. Moreover, we note that the exclusion of the testimony of these witnesses did not prevent Henderson from presenting evidence that he modified the tattoo as part of an attempt to leave the gang.

In sum, in each of the claimed erroneous evidentiary rulings, the district court did not abuse its discretion.

*Failure to Instruct on Accomplice Testimony*

■■■■■ A defendant may not be convicted based solely on the uncorroborated testimony of an accomplice. *See* Minn. Stat. § 634.04 (2000);[6] *State v. Mathiasen*, 267 Minn. 393, 397 & n. 3, 127 N.W.2d 534, 538 & n. 3 (1964) (reversing a conviction where the record contained no evidence that corroborated the accomplice's testimony or supported a finding of the defendant's guilt). The general rule regarding accomplice testimony requires courts to caution jurors about the nature of accomplice testimony because it is not uncommon for an accomplice to testify against a defendant for self-serving purposes.[7] *See State v. Shoop*, 441 N.W.2d 475, 479 (1989). An accomplice instruction need not be given in every criminal case, but "it must be given in any criminal case in which any witness against the defendant might reasonably be considered an accomplice to the crime." *Id.* If it is unclear whether a witness is an accomplice, the jury should make that determination. *See State v. Flournoy*, 535 N.W.2d 354, 359 (Minn. 1995).

Henderson argued that he was entitled to an instruction in connection with the testimony of Dedra Johnson, April Bell, Andrew Neal and, through Herbert Williams, Donte Evans.[8] Henderson ar-

**6.** Minnesota Statutes § 634.04 provides:

A conviction cannot be had upon the testimony of an accomplice, unless it is corroborated by such other evidence as tends to convict the defendant of the commission of the offense, and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.

**7.** See 10 Minn.Dist. Judges Ass'n, *Minnesota Practice, Jury Instruction Guides, Criminal*, JIG 3.18 (4th ed.1999), which provides in part:

You cannot find defendant guilty of a crime on the testimony of a person who could be charged with that crime, unless that testimony is corroborated by other evidence which tends to convict defendant of the crime. Such a person who could be charged for the same crime is called an accomplice.
\* \* \* \*
(If you find that (any person who has testified in this case) is a person who could be charged with the same crime as defendant, you cannot find defendant guilty of a crime

on that testimony unless that testimony is corroborated.)

**8.** During the instruction conference, Henderson also requested that an accomplice instruction be given for Andrew Neal. However, Henderson failed to raise any substantive argument with respect to Neal's alleged role as an accomplice during the conference or later during the jury charge. Furthermore, none of the testimony placed Neal at the scene of the crime or in such a position that he could have played " 'some knowing role in the commission of the crime.' " *Flournoy*, 535 N.W.2d at 359 (quoting *State v. Russell*, 503 N.W.2d 110, 114 (Minn.1993)). Therefore, we find no error in the district court's decision to refuse to give an accomplice instruction with respect to the testimony of Neal.

In his brief, Henderson also complains that an accomplice instruction was not given in connection with the out-of-court statements of McKee that were introduced through the testimony of Williams and Johnson under a hearsay exception. However, at the instruc-

gued that an instruction was necessary because Johnson and Bell could be charged as accomplices or accomplices after the fact. He also asserted that because Williams' testimony contained hearsay statements of Evans, who was indicted for the Gatlin murder, he was entitled to an accomplice instruction in connection with that testimony.

 The test for whether a witness is an accomplice for purposes of section 634.04 is whether the witness could have been indicted and convicted for the crime with which the accused is charged. *See State v. Swyningan*, 304 Minn. 552, 555, 229 N.W.2d 29, 32 (1975). However,

> where the acts of several participants are declared by statute to constitute separate and distinct crimes, the participants guilty of one crime are not accomplices of those who are guilty of a separate and distinct crime. Thus, * * * an accessory after the fact is not an accomplice of the principal.

*Id.* at 555–56, 229 N.W.2d at 32 (citations omitted). The district court found that neither Bell nor Johnson was an accomplice to the murder and they could only be charged as accomplices after the fact. Henderson does not appear to contest that determination with respect to Johnson, but claims that Bell clearly could have been indicted and convicted of murder given her aid to the principals.

The court also denied Henderson's request for an accomplice instruction with respect to Williams' testimony about Evans' statements. The state argues that section 634.04 applies only to "testimony" of an accomplice and not to out-of-court statements admitted through other witnesses. While arguably the same concerns regarding reliance on accomplice testimony exist regardless of the form in which the statements are presented to the jury, we need not decide whether section 634.04 applies to out-of-court statements by an accomplice. Even if the court erred in not giving the instruction as to Evans (through Williams) and Bell, any error is harmless. *See State v. Shoop*, 441 N.W.2d at 480 (holding erroneous refusal to instruct on accomplice testimony subject to harmless error analysis).

 In applying the harmless error test, we examine all relevant factors to determine "whether, beyond a reasonable doubt, the error did not have a significant impact on the verdict." *Shoop*, 441 N.W.2d at 481. In *Shoop*, we noted that the accomplice testimony was not given under a promise of leniency, as is the case with respect to Evans' statement. *See id.* We also noted in *Shoop* that the state's evidence was overwhelming, including independently corroborating evidence. *See id.* In this case, Henderson's own statements to others corroborate the statements of Evans and Bell as to the events surrounding the murder. Therefore, any error in failing to instruct the jury on accomplice testimony was harmless.

*Prosecutorial Misconduct*

Henderson asserts that prosecutorial misconduct during trial and closing arguments constituted reversible error. Henderson claims that the prosecutor intentionally engaged in conduct that he knew would elicit inadmissible evidence, improperly appealed to the passions and prejudices of the jury, implied that defense counsel had engaged in improper conduct, and shifted the burden of proof. Alternatively, Henderson argues that even if the alleged prosecutorial misconduct did not rise to the level of reversible error standing alone, when considering the misconduct in conjunction with the numerous other alleged trial errors, he is entitled to a new trial.

 Prosecutors have an affirmative obligation to ensure that a defendant

tion conference, Henderson did not mention McKee. Further, our review of Williams' and Johnson's testimony revealed no statements

by McKee that inculpated Henderson, and Henderson failed to direct us to any such statements in his brief.

receives a fair trial. *See State v. Sha*, 292 Minn. 182, 185, 193 N.W.2d 829, 831 (1972). The question of whether a new trial should be granted due to prosecutorial misconduct rests within the discretion of the district court. *See State v. Voorhees*, 596 N.W.2d 241, 253 (Minn.1999). We will not disturb a district court's conclusion that no misconduct occurred unless the misconduct, viewed in light of the entire record, was so inexcusable, serious, and prejudicial that the defendant's right to a fair trial was denied. *See State v. Wahlberg*, 296 N.W.2d 408, 420 (Minn.1980).

Henderson asserts that it was misconduct for the prosecutor to ask Andrew Neal if he knew that the defense was accusing him of having something to do with Gatlin's murder. The district court struck both the question and answer. It is improper for a prosecutor to ask questions that are calculated to elicit or insinuate an inadmissible and highly prejudicial answer. *See State v. Harris*, 521 N.W.2d 348, 354 (Minn.1994). As there is no indication the prosecutor persisted in trying to elicit testimony the court had ruled inadmissible, the district court did not abuse its discretion in finding that there was no prosecutorial misconduct.

In addition, Henderson complains of the prosecutor's questioning of Henderson's counselor from a local community center. The prosecutor asked if Henderson had been ordered to take anger management classes. Henderson's anger management classes were part of his probation requirements, reference to which the district court had already prohibited. Henderson's attorney objected to the question and the court sustained the objection.

The state agrees that the fact that Henderson was ordered to take anger management classes was not admissible, but argues that Henderson opened the door to such inquiry when he attempted to present a favorable but inaccurate picture of himself at trial. *See State v. Goar*, 295 N.W.2d 633, 634–35 (Minn.1980) (noting that a defendant may open the door to otherwise improper character evidence by presenting himself in a misleading light). Again, as there is no indication the prosecutor persisted after the judge struck the question and answer, and because the state had an arguable claim that Henderson opened the door to this testimony, we hold that the questions as posed do not constitute prosecutorial misconduct.

With respect to the prosecutor's closing arguments, Henderson argues that the prosecutor improperly appealed to the passions and prejudices of the jury. Henderson challenges, among others, the following statement by the prosecutor:

> This is a case of gang violence. This isn't a case where two parties from the suburbs are having a dispute. One party from Edina and another party from North Oaks are having a minor dispute. This is a case about gang violence. Gangs.

Henderson asserts that, with this statement, the prosecutor improperly suggested to the jury that because Henderson was identified as a gang member he was a violent person with a propensity to commit crimes. Henderson also challenges this statement:

> [T]he people that are involved in this world are not people from your world. Their experiences, their lifestyles are totally foreign to all of you. These are not your world. These are the Defendant's people. They are his friends.

Henderson complains that this argument improperly emphasized to the all-white jury that appellant and all of his witnesses are black. Appellant's objection was overruled. The prosecutor went on to state:

> [T]he challenge to you is this: It's very easy to dismiss these people because their lifestyles are so different from yours. But if you do that it works an injustice. You must remain open-minded, not judge them for their lifestyles; because this is the Defendant's lifestyle.

The state asserts that these comments are not about race, rather they are an explanation of a world unfamiliar to the jurors, and that the comments were intended to convey to the jury that although the victim was a gang member, his life should not be dismissed.

Henderson also complains of the prosecutor's suggestion in closing argument that Henderson failed to produce evidence to support his theory of the case or his alibi. Additionally, Henderson protests the prosecutor's comments implying that defense counsel made statements in opening argument that were not supported by evidence presented at trial. Henderson asserts that the prosecutor's comments were intended to shift the burden of proof to Henderson and constituted a comment on Henderson's failure to testify.

■■■■ The comments made by the prosecutor in his closing argument cause us concern, but do not rise to the level of prosecutorial misconduct. The comments about the different world Henderson lived in arguably discouraged the jury from discounting the value of Gatlin's life. *See State v. Robinson,* 604 N.W.2d 355, 362–63 (Minn.2000) ("In the context of the circumstances surrounding the crime, it seems clear that these comments did little more than prepare the jury for evidence of an unfamiliar world * * *."). Comments suggesting that Henderson had the burden of proof were likely cured by the judge's instruction to the jury that the defendant does not have to prove innocence. As a result, we conclude that the alleged misconduct, viewed in light of the entire record, was not so inexcusably serious and prejudicial that Henderson's right to a fair trial was denied. *See Wahlberg,* 296 N.W.2d at 420.

*Cumulative Effect*

Henderson argues that the cumulative effect of all the aforementioned alleged trial errors denied his constitutional due process right to a fair trial and he is therefore entitled to a new trial. Because we have determined that the district court did not abuse its discretion in its evidentiary rulings, or in finding no prosecutorial misconduct, and that any error in refusing to give an accomplice instruction to the jury was harmless in light of the evidence presented, we cannot conclude that Henderson's due process rights were violated. Accordingly, a new trial is not warranted on that basis.

## II.

■■■■ Henderson argues that the prosecutor's peremptory strike of juror 19 violated his right to a fair trial under *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and Minn. R.Crim.P. 26.02, subd. 6(a). The use of peremptory challenges to exclude persons from a jury solely on the basis of race is prohibited by the Equal Protection Clause of the United States Constitution. In making a *Batson* challenge, the defendant first must establish a prima facie case of purposeful discrimination. *See Batson,* 476 U.S. at 96, 106 S.Ct. 1712. In order to establish a prima facie case for a *Batson* challenge, the defendant must show: (1) "that one or more members of a racial group have been peremptorily excluded from the jury"; and (2) "that circumstances of the case raise an inference that the exclusion was based on race." *State v. DeVerney,* 592 N.W.2d 837, 843 (Minn. 1999) (citation and internal quotation marks omitted). If the defendant makes out a prima facie case of discrimination, then the burden shifts to the state to offer a racially neutral reason for the strike. *See Batson,* 476 U.S. at 97, 106 S.Ct. 1712. The defendant may attempt to prove that the reason proffered by the state was pretextual. *Cf. State v. James,* 520 N.W.2d 399, 403–04 (Minn.1994) (discussing the defendant's argument that the prosecutor's reason for striking a juror was pretextual). Whether there is racial discrimination in the exercise of a peremptory challenge is a factual determination to be made by the district court, and that determination will

not be reversed absent clear proof that the state's reason for the challenge was pretextual. *See id.* at 403–04; *see also DeVerney,* 592 N.W.2d at 844.

Juror 19 was a 22–year–old, African–American woman who had no legal training and had never served on a jury. During voir dire she stated that she had five friends who had been killed. Of the four deaths for which she could remember the details, one was killed in a dispute over money; one was shot in a random killing while sitting in a car; one was shot in a gang-related shooting; and one was killed by a semi-trailer truck while attempting to cross a freeway. She stated that she had three or four friends who were in prison for serious crimes, at least one of whom was a gang member, but she was unsure whether he was incarcerated for a gang-related offense. Finally, juror 19's father had been a corrections officer and was killed by a prison inmate. She indicated on her juror questionnaire that none of her experiences would affect her ability to apply the presumption of innocence to Henderson or cause her to be biased against Henderson or the state.

After questioning juror 19, the state used a peremptory challenge to strike her from the jury. Henderson challenged the strike under *Batson* and Minn.R.Crim.P. 26.02, subd 6(a). Henderson argued that the prima facie case for a *Batson* challenge had been made because both juror 19 and Henderson are African–American, and it was statistically unlikely that any other African–Americans would be empanelled. Henderson further argued that the challenge was pretextual because the state asked questions specifically designed to give some reason to exclude the juror without asking any questions regarding the juror's state of mind or how her experiences would affect her ability to make a decision in this case. The district court concluded that the state's actions in striking juror 19 demonstrated no evidence of subterfuge or any racial motive. Accord-

ingly, the court denied Henderson's *Batson* challenge.

■ In addition to arguing simply that juror 19 was African–American, Henderson argued that by failing to ask certain questions, the state established a pretextual foundation for the racially-motivated strike. We are of the opinion that questions *not* asked by the state cannot establish an inference of a racially-motivated strike. Moreover, Henderson's argument that the state's failure to ask certain questions results in an inference that the state struck the juror because of race goes to future stages of the *Batson* analysis, namely whether the state's proffered, racially-neutral explanation is merely a pretext. Henderson must establish his prima facie case before asserting any basis for pretext.

■ In finding that the state's questions were not subterfuge and did not reflect any racial motive, the district court's conclusion could be viewed effectively as a ruling on pretext rather than on whether Henderson made out his prima facie case. Where a district court resolves the issue of pretext first instead of addressing whether a prima facie case was made, "the issue whether the defendant established a prima facie case of the discriminatory use of a peremptory strike is moot." *State v. Gaitan,* 536 N.W.2d 11, 15 (Minn.1995).

■ Based on the record before this court, we conclude the district court did not abuse its discretion because Henderson failed to make out a prima facie case based on questions not asked by the state. Further, we conclude that there is no clear proof that the prosecutor's stated reason for the challenge was pretextual.

### III.

■ Henderson argues in his pro se brief that the evidence presented at trial was not sufficient to convict him of either first-degree murder or a crime committed for the benefit of a gang. In reviewing a sufficiency of the evidence challenge, we

review the record in the light most favorable to the conviction to determine whether the evidence reasonably could have permitted the jury to convict. *See State v. Webb,* 440 N.W.2d 426, 430 (Minn.1989). This court recognizes that the jury is in the best position to evaluate the witnesses' credibility and will assume that, after proper consideration, the jury believed the state's witnesses and disbelieved the defendant's witnesses. *See State v. Bliss,* 457 N.W.2d 385, 390 (Minn.1990); *see also State v. Profit,* 591 N.W.2d 451, 467 (Minn. 1999).

 Under Minn.Stat. § 609.185, Henderson was guilty of first-degree murder if the state proved that Henderson intended to cause the death of Juwan Gatlin with premeditation. There was testimony that Henderson told others that he killed Gatlin, was present at the murder scene, assisted in the disposal of the gun, and encouraged others to lie to the police regarding his whereabouts at the time Gatlin was killed. In addition, accomplice out-of-court statements identified Henderson as the first shooter.

 Henderson was guilty under Minn.Stat. § 609.229 if the state produced sufficient evidence to prove that Henderson killed Gatlin for the benefit of the Mickey Cobras gang. Trial testimony demonstrated that Gatlin was a member of the Mickey Cobras, as were Henderson, Evans, and McKee. There was also evidence that Gatlin's murder was a retaliatory act because two members of the Mickey Cobras were jailed in connection with the Dawson murder as a result of information Gatlin provided to the police.

We conclude that the record contained sufficient evidence, if believed by the jury, to find that Henderson killed Gatlin, that the killing was premeditated, and that the killing was committed for benefit of the Mickey Cobras gang. Therefore, Henderson is not entitled to a new trial based on sufficiency of the evidence.

## IV.

Henderson alleges in his pro se brief that the sentence he received for violation of Minn.Stat. § 609.229, subds. 1 and 2, a crime committed for the benefit of a gang, was in violation of Minn.Stat. § 609.095 [9] (providing legislature has exclusive authority to define range of sentences), and Minn.Stat. § 609.10 [10] (listing sentences available). Henderson was sentenced to life in prison on count one, first-degree murder, and to five years to be served consecutively for count two, a crime committed for the benefit of a gang. Henderson asserts that because the convictions are for a single course of conduct, he is subject to a single sentence specifically enumerated under section 609.10, and that life plus a term of years is not a specifically enumerated sentence. Accordingly, Henderson contends that his sen-

---

9. Minnesota Statutes § 609.095 provides in part:

 (a) The legislature has the exclusive authority to define crimes and offenses and the range of the sentences or punishments for their violation. No other or different sentence or punishments shall be imposed for the commission of a crime than is authorized by this chapter or other applicable law.

10. Minnesota Statutes § 609.10 provides in relevant part:

 Subdivision 1. Sentences Available. Upon conviction of a felony and compliance with the other provisions of this chapter the court, if it imposes sentence may sentence the defendant to the extent authorized by law as follows:

 (1) to life imprisonment; or

 (2) to imprisonment for a fixed term of years set by the court; or

 (3) to both imprisonment for a fixed term of years and payment of a fine; or

 (4) to payment of a fine without imprisonment or to imprisonment for a fixed term of years if the fine is not paid; or

 (5) to payment of court-ordered restitution in addition to either imprisonment or payment of a fine or both; or

 (6) to payment of a local correctional fee as authorized under section 609.102 in addition to any other sentence imposed by the court.

tence for life in addition to a term of years is illegal.

Section 609.095 states that only the legislature may define the range of sentences or punishments for violation of criminal statutes. Further, section 609.095 states that no sentence may be imposed other than is authorized by chapter 609 *or other applicable law.* *See* Minn.Stat. § 609.095(a) (2000). It is apparent that section 609.10 does not provide for life imprisonment plus a term of years. However, the statute under which Henderson was convicted, section 609.229, provides that the statutory maximum sentence for having committed a crime for the benefit of a gang is five years *longer* than the statutory maximum for the underlying crime if the underlying crime is a felony. *See* Minn.Stat. § 609.229, subd. 3(a) (2000). In this case, section 609.229 is the applicable law for Henderson's crimes, and does provide for the sentence Henderson received.

We conclude that Henderson's sentence does not violate the applicable statutory law and we need not remand on this issue.

Henderson's convictions and sentence are affirmed.