# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-3705

_____

| | | |
|---|---|---|
| Demetrius Gatlin, as Trustee for the Estate of Juwan Gatlin, | * * * | |
| Appellant, | * * | |
| v. | * * * | Appeal from the United States District Court for the District of Minnesota. |
| Sergeant Michael Green, individually and in his official capacity as a Minneapolis Police Officer; City of Minneapolis, a municipal corporation, | * * * * * * | |
| Appellees. | * | |

_____

Submitted: December 15, 2003
Filed: March 16, 2004

_____

Before WOLLMAN, GIBSON, and RILEY, Circuit Judges.

_____

RILEY, Circuit Judge.

Juwan Gatlin (Gatlin) was murdered by Mickey Cobra (MC) gang members after Gatlin cooperated with police. Demetrius Gatlin (Mrs. Gatlin), Gatlin's widow and trustee for Gatlin's estate, filed this lawsuit against a Minneapolis police detective and the City of Minneapolis (City), alleging violations of federal and state

law. The district court[1] entered summary judgment in favor of the defendants on Mrs. Gatlin's federal claims and declined to exercise jurisdiction over the state law claims. Mrs. Gatlin appeals. We affirm.

## I. BACKGROUND

Gatlin was a long-time member of the MC gang. In June 1997, while serving time in the Hennepin County Jail on charges of armed robbery, Gatlin told authorities he wished to cooperate in exchange for assistance with his state charges and a chance to start a new life free of gang ties. Minneapolis Police Sergeants Michael Green (Sergeant Green) and Michael Carlson (Sergeant Carlson) interviewed Gatlin. Gatlin told Sergeants Green and Carlson what he knew about criminal activities perpetrated by the MC gang and other gangs, including detailed information relating to the suspected MC gang-murder of Anthony Dawson (Dawson), a member of the Gangster Disciples.

In April 1998, based on information obtained from Gatlin, Arthur Hurd (Hurd) was indicted and arrested for Dawson's murder and a related attempted murder. In May 1998, the Minnesota state court reduced Gatlin's twelve and one-half year sentence for armed robbery to three years probation in return for his vital assistance. The sentencing judge ordered Gatlin to maintain contact with the prosecutor and police, to cooperate fully in Hurd's prosecution, and to testify when called to do so.

While awaiting trial, Hurd was incarcerated in the Carver County Detention Center. In June 1998, during a routine mail inspection, Carver County Sheriff officials discovered Hurd had attempted to mail a transcript[2] of Gatlin's police statement to Andrew Neal (Neal), a MC gang member, along with a handwritten note

---

[1]The Honorable James M. Rosenbaum, Chief Judge, United States District Court for the District of Minnesota.

[2] Presumably, Hurd received a copy of Gatlin's statement from his attorney.

stating, "Check this out. Something must be done about this." Upon discovering the transcript and note, Sergeant Reed Ashpole (Sergeant Ashpole) called Sergeant Green, whose name was recorded as an interviewer in the transcript. Sergeant Green had since been reassigned and was no longer actively working on the Dawson murder case. However, Sergeant Green accepted the call, and the Sergeants discussed whether the Hurd letter should be subpoenaed. Sergeant Green told Sergeant Ashpole to hold the Hurd letter until Sergeant Green could explore the matter. Sergeant Green immediately called Gary McGlennen (Prosecutor McGlennen), the Assistant Hennepin County Attorney in charge of prosecuting the Hurd case, and asked for the position of the Hennepin County Attorney's Office on mailing the intercepted Hurd letter. Prosecutor McGlennen told Sergeant Green he would find out and call Sergeant Green back.

Two days later, Sergeant Ashpole again called Sergeant Green to ask what should be done with the intercepted Hurd letter. At this time, Prosecutor McGlennen had not provided Sergeant Green with an answer to his inquiry. What Sergeant Green told Sergeant Ashpole in the second telephone call is disputed. Sergeant Ashpole testified Sergeant Green told him the police were not interested in subpoenaing the Hurd letter and it could be mailed. Sergeant Green testified he told Sergeant Ashpole that he had not received an answer from the Hennepin County Attorney's Office; but also advised that, if the Carver County Sheriff Department's policies did not prohibit mailing the Hurd letter, then Sergeant Green personally did not know how the Hurd letter could lawfully be withheld from mailing. Prison authorities released the hold on the Hurd letter, and the Hurd letter was mailed to Neal.[3]

Upon discovering the Hurd letter had been mailed, Sergeant Green notified Sergeant Carlson, who contacted Gatlin on July 8, 1998, and advised him of the

_____

[3]A copy of the Hurd letter, retained by the Carver County authorities, was subsequently lost.

3

mailing. Gatlin told Sergeant Carlson he already knew his police statement had been mailed, because Gatlin had already spoken with Neal, a life-long friend of Gatlin's. According to Gatlin, Neal had little influence in the MC gang. Gatlin informed Sergeant Carlson that Neal said he was considering whether to circulate Gatlin's police statement to MC gang members. Gatlin also told Sergeant Carlson he did not believe Neal would circulate Gatlin's statement; but, if Neal did circulate the statement, Gatlin's life would be in danger. Gatlin did remind Sergeant Carlson of Gatlin's fear for his safety and the safety of his family.

The following day, officers brought Gatlin to the police station, and Prosecutor McGlennen moved the state court to alter the terms and conditions of Gatlin's probation to allow him to leave Minnesota until he was needed to testify. The court granted the motion, and the prosecutor's office made preliminary arrangements through its Victim/Witness Protection Program to finance Gatlin's relocation to Arkansas. On the same day, the City's police department advanced $350 to Gatlin so he could stay in a Wisconsin hotel over the weekend until Gatlin obtained relocation funds from the prosecutor's office. Early the following week, the Victim/Witness Protection Program issued Gatlin a $450 check, paid for an automobile tune up, paid for a U-Haul trailer, and agreed to provide additional funds to cover Gatlin's first month's rent and security deposit in Arkansas. Thereafter, City and Hennepin County officials believed Gatlin had left Minnesota and relocated to Arkansas.

Less than a month later, on August 7, 1998, police found Gatlin's body in a Minneapolis alley. Gatlin had been "shot between 13 and 15 times with a .40 caliber Smith and Wesson handgun." State v. Henderson, 620 N.W.2d 688, 693 (Minn. 2001). It was widely believed Gatlin was "murdered because he provided the police with information about the unsolved murder of Anthony Dawson." Id. Following a police investigation, three MC gang members were indicted for Gatlin's murder. Id. at 694. One indicted gang member was reportedly killed in Chicago before police

4

could arrest him, and another indicted gang member pled guilty. A third indicted gang member was convicted by a jury of murdering Gatlin. Id. at 693.

Mrs. Gatlin filed this lawsuit, asserting both federal and state law claims against Sergeant Green and the City. Mrs. Gatlin claimed Gatlin was deprived of his federal constitutional and civil rights under 42 U.S.C. §§ 1981, 1983, and 1986 (2000). She also alleged numerous state law claims, including common-law claims of negligence, breach of contract, and placement in mortal danger leading to death, as well as statutory violations of the Minnesota Human Rights Act and the Minnesota Government Data Practices Act. Sergeant Green and the City moved for summary judgment. The district court granted summary judgment in favor of Sergeant Green on the basis of qualified immunity and also granted summary judgment in favor of the City on all federal claims. The district court declined to exercise supplemental jurisdiction over the state law claims.

## II.   DISCUSSION

We review de novo a district court's grant of summary judgment. Anderson v. Larson, 327 F.3d 762, 767 (8th Cir. 2003). A de novo standard of review is also applicable when a district court grants summary judgment on the basis of qualified immunity. Omni Behavioral Health v. Miller, 285 F.3d 646, 650 (8th Cir. 2002). A district court properly grants summary judgment when the record, viewed in the light most favorable to the nonmoving party, "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

### A.    Claims Against Sergeant Green

In Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982), the Supreme Court explained that "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person

would have known." To survive summary judgment based on the affirmative defense of qualified immunity, a claimant must "(1) assert a violation of a constitutional right; (2) demonstrate that the alleged right is clearly established; and (3) raise a genuine issue of fact as to whether the official would have known that his alleged conduct would have violated plaintiff's clearly established right." Omni Behavioral Health, 285 F.3d at 651 (quoting Habiger v. City of Fargo, 80 F.3d 289, 295 (8th Cir. 1996)).

Mrs. Gatlin's federal constitutional claims against Sergeant Green satisfy none of these requirements. Count Six alleges Sergeant Green's actions "caused the intentional deprivation of the constitutional and civil rights of Mr. Gatlin, in violation of 42 U.S.C. § 1983, thereby causing Plaintiff to suffer damages as alleged herein." "Section 1983 does not confer substantive rights but merely provides a means to vindicate rights conferred by the Constitution or laws of the United States." Wilson v. Spain, 209 F.3d 713, 715 (8th Cir. 2000). Section 1983 requires a claimant to identify the particular right that has been violated. DuBose v. Kelly, 187 F.3d 999, 1004 (8th Cir. 1999).

Mrs. Gatlin failed to identify any violation of a right protected under the Constitution or federal law–an essential element of a section 1983 claim. See Isakson v. First Nat'l Bank in Sioux Falls, 990 F.2d 1098, 1098 (8th Cir. 1993). Instead of finding the pleading deficiency fatal, which it is, the district court liberally construed the claim to allege a substantive due process claim in violation of the Fourteenth Amendment. Even if Mrs. Gatlin had successfully pled a substantive due process claim, nothing Sergeant Green did – or did not do – established either a state-created danger or special relationship which imposed an affirmative duty upon Sergeant Green to protect Gatlin from third-party harm. See DeShaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189, 194-97 (1989) (explaining exceptions to the general rule that the Due Process Clause does not impose a duty on states to protect citizens against private violence). The purpose of the Due Process Clause is "to

6

protect the people from the State, not to ensure that the State protected them from each other." Id. at 196.

Gatlin made a courageous decision to leave the MC gang, to cooperate with police, and to start a new life. By cooperating with police in exchange for a reduced sentence and a chance to relocate, Gatlin knowingly assumed a considerable risk that MC gang members would eventually discover his cooperation and seek to avenge him. Gatlin was a twenty-five year MC gang veteran. He could evaluate better than anyone the deadly risk inherent in cooperating with police. The actions of Sergeant Green, fellow police officers, Prosecutor McGlennen, the victim/witness personnel, and the state judiciary were undertaken with a solitary purpose–to minimize the risk of a retaliatory gang "hit" against Gatlin by providing him with the legal and financial means necessary to flee his would-be avengers. Mrs. Gatlin's contention that more protective measures could have been taken is unavailing based on the record. That Gatlin would ultimately remain in or return to Minneapolis without informing authorities was unknown to Sergeant Green. Gatlin miscalculated the grave risk of harm he assumed. Tragically, his miscalculation cost him his life.

In Count Seven, Mrs. Gatlin asserts Sergeant Green violated Gatlin's equal protection rights on the basis of race by treating Gatlin, an African American, less favorably than Caucasian government witnesses. For any equal protection claim, the threshold inquiry is "whether the [claimant] is similarly situated to others who allegedly received preferential treatment." Domina v. Van Pelt, 235 F.3d 1091, 1099 (8th Cir. 2000). We have recognized state actors "may . . . treat dissimilarly situated people dissimilarly without running afoul of the protections afforded by the clause." Bogren v. Minnesota, 236 F.3d 399, 408 (8th Cir. 2000). The district court correctly ruled Mrs. Gatlin failed to establish either a racial animus motivated Sergeant Green's actions relating to the release of the Hurd letter, or that Gatlin was similarly situated

7

to witnesses in the Haaf murder case,[4] another gang murder retaliation in the same community. We agree with the district court this claim is insufficient as a matter of law, and Sergeant Green is entitled to qualified immunity.

### B. Claims Against the City

Mrs. Gatlin also filed federal civil rights claims against the City. Municipal liability under section 1983 is premised on the existence of two prerequisites: (1) a policy, practice, or custom must be attributable to the City through actual or constructive knowledge; and (2) the policy, practice, or custom must directly cause constitutional injury. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978). Having reviewed the record, we find no evidence of a discriminatory law enforcement policy, practice, or custom, nor do we find any evidence suggesting a direct causal link between any policy, practice, or custom and Gatlin's death.

In Count Eight, Mrs. Gatlin alleged the City failed to properly train Sergeant Green and other police officers, thereby encouraging a policy and custom of persistent and widespread discriminatory practices. Under certain circumstances, a municipality can be liable under section 1983 for constitutional violations resulting from its failure to adequately train its employees. City of Canton v. Harris, 489 U.S. 378, 380 (1989); Larkin v. St. Louis Hous. Auth. Dev. Corp., 355 F.3d 1114, 1117 (8th Cir. 2004). "Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." City of Canton, 489 U.S. at 389 (citations omitted).

---

[4]The late Jerome Haaf was a Minneapolis police officer who was murdered in September 1992 by Vice Lord gang members "in retaliation for the beating of a blind black man by Metropolitan Transit Commission police." State v. Willis, 559 N.W.2d 693, 696 (Minn. 1997).

Mrs. Gatlin claims Sergeant Green and other City police officers received inadequate training in witness and informant protection and in jail communications. We agree with the district court that federal law does not, under these circumstances, impose a duty on municipalities to implement policies in their police departments pertaining to witness protection and prison administration. We also agree with the district court's conclusion that "no reasonable jury could decide a lack of training in these areas resulted in Gatlin's death."

In Count Nine, Mrs. Gatlin alleged the City failed to prevent wrongs in violation of 42 U.S.C. § 1986, which creates an action for neglect to prevent commission of a section 1985 claim. Mrs. Gatlin theorizes the City knew in advance of Sergeant Green's actions regarding the Hurd letter; the City knew Sergeant Green's actions were unlawful; and the City was in a position to have prevented Gatlin's gang murder. A section 1986 claim must be predicated upon a valid section 1985 claim.[5] Jensen v. Henderson, 315 F.3d 854, 863 (8th Cir. 2002). The district court properly ruled that Gatlin had failed to plead a violation of any right protected under section 1985. We have reviewed the record and find no evidence to support Mrs. Gatlin's theory that Sergeant Green and others conspired to violate Gatlin's equal protection, due process, or voting rights, or that the City had knowledge of any alleged conspiracy to violate Gatlin's rights. A claimant's failure to plead the essential

[5] Title 42 U.S.C. § 1985(3) provides in relevant part:

If two or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws . . . [and] if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.

elements of a claim is a fatal deficiency warranting dismissal of the claim. The district court properly dismissed Mrs. Gatlin's conspiracy claim.

### C. Pendent State Claims

Because the district court correctly dismissed Mrs. Gatlin's federal claims, the court properly exercised its discretion to decline to accept supplemental jurisdiction over the pendent state claims. See 28 U.S.C. § 1367(c)(3).

## III. CONCLUSION

We affirm the district court's grant of summary judgment on the federal civil rights claims. We also grant the appellees' motion to strike evidence and arguments offered by Mrs. Gatlin that were not presented below.

_____