# STATE OF MINNESOTA
# IN COURT OF APPEALS
# A23-0875

State of Minnesota,
Respondent,

vs.

Seneca Warrior Steeprock,
Appellant.

**Filed July 29, 2024**
**Reversed and remanded; motion denied**
**Bratvold, Judge**

St. Louis County District Court
File No. 69-DU-CR-21-26

Keith Ellison, Attorney General, Thomas R. Ragatz, Keaon Dousti, Assistant Attorneys General, St. Paul, Minnesota; and

Kimberly J. Maki, St. Louis County Attorney, Duluth, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Benjamin J. Butler, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Connolly, Presiding Judge; Bratvold, Judge; and Jesson, Judge.[*]

## SYLLABUS

1.  A valid search warrant is required when the state takes a defendant's saliva sample under Minn. R. Crim. P. 9.02, subd. 2(1), for the express purpose of determining whether the defendant's DNA was on a weapon involved in a crime.

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

2. Under Minn. Stat. § 634.04 (2020), which provides that a conviction cannot be based on the uncorroborated testimony of an accomplice, "testimony" means statements made under oath.

**OPINION**

**BRATVOLD**, Judge

Appellant Seneca Warrior Steeprock appeals from the final judgments of conviction for attempted first-degree murder and unlawful possession of a firearm. Steeprock challenges his convictions on three grounds. First, Steeprock argues that his constitutional rights were violated when respondent State of Minnesota took a saliva sample from him pursuant to a discovery order issued under Minn. R. Crim. P. 9.02, subd. 2(1)(f), because no valid search warrant authorized the search. Second, Steeprock argues that the district court abused its discretion by refusing to instruct the jury that accomplice testimony requires corroboration. And third, Steeprock argues that the district court abused its discretion by admitting hearsay evidence under the exception allowing statements against a declarant's penal interest. Steeprock also moves to strike parts of the state's supplemental response brief.

Our analysis of the saliva-sample issue yields four conclusions. First, the state conducted a search when it obtained a sample of Steeprock's saliva after securing a court order under rule 9.02, subdivision 2(1)(f), for the express purpose of determining whether Steeprock's DNA matched DNA found on a weapon used in the crime charged. Second, the state violated Steeprock's constitutional rights by taking the saliva sample under rule 9.02, subdivision 2(1)(f), without a valid search warrant. Third, the exclusionary rule

applies to the unconstitutional search and the fruits of the search; thus, the state's DNA evidence against Steeprock must be suppressed. Fourth, the constitutional error in admitting the DNA evidence at Steeprock's jury trial was not harmless beyond a reasonable doubt. We therefore reverse Steeprock's convictions and remand for a new trial.

Because the issue is likely to recur on remand, we also determine that the district court did not abuse its discretion when it refused Steeprock's request to instruct the jury that accomplice testimony requires corroboration, as Minn. Stat. § 634.04 provides. When understood in context, "testimony" as used in section 634.04 is a technical term that refers to an accomplice's statements under oath, and Steeprock's accomplice did not testify. We decline to decide whether the district court abused its discretion by admitting the hearsay statements of Steeprock's accomplice. Finally, we deny Steeprock's motion to strike parts of the state's supplemental response brief.

**FACTS**

The state charged Steeprock with attempted first-degree murder under Minn. Stat. §§ 609.185(a)(1), .17(1) (2020) and unlawful possession of a firearm under Minn. Stat. § 624.713, subd. 1(2) (2020).[1] The following summarizes the evidence received during the jury trial.

On December 27, 2020, the victim, C.J., drove a silver Honda sedan to Duluth to visit his cousin. C.J.'s cousin was acquainted with A.C. A.C.'s brother (brother) and C.J.

---

[1] The state's complaint charged Steeprock with aiding and abetting attempted first-degree murder, but the state abandoned the aiding-and-abetting theory during trial.

3

did not "get along"; there was "beef between the two of them." During C.J.'s visit to Duluth, brother was detained in the Beltrami County Jail.

On December 28, C.J.'s cousin asked C.J. to "give [A.C.] a ride." C.J. agreed, and he and his cousin "picked [A.C.] up" from a pharmacy in the Honda sedan. A.C. wanted them "to hang out." C.J.'s cousin "went back home." C.J. said he would "hang out with" A.C.

On December 29 at 12:46 p.m., A.C. messaged C.J. via social media asking where he was. C.J. did not respond.

Around 1:00 p.m., A.C. called brother at the county jail (first jail call). The phone call was recorded. Brother asked if A.C. had to "feed that n-gga last night?" A.C. replied that she was going to "go see that n-gga today" but that he was not "messag[ing her] back or anything." Brother said, "Just leave it alone." A.C. said she knew "two spots he could be in." Brother said, "Wherever you're f--king going man, I'm pretty sure there's too much f--king cameras around there." A.C. replied, "I'm familiar with Duluth . . . I'm good, bro, don't worry."

On the afternoon of December 29, C.J. was at T.H.'s apartment. Although T.H. had never met C.J. before that day, C.J. "asked if he could sleep in . . . or sit and chill in the extra [bed]room." T.H. agreed. The apartment had a screen door off the porch that led into the extra bedroom.

While C.J. was in the extra bedroom, T.H. was in another room and heard him "talking to a female on the phone." A call log from C.J.'s phone showed that he called A.C. at 1:54 p.m. About 45 minutes to an hour later, T.H. was cleaning "in the front room by

4

[her]self" and "heard the screen door" open and "creak." Based on "how long the screen door" creaked, T.H. believed "two to three people" had entered her apartment. T.H. heard "popping noises," and C.J. yelled, "Call an ambulance."

T.H. did not see who shot C.J., and C.J. testified that he did not remember who shot him. As a result of the shooting, C.J. suffered injuries to his rectum, bladder, and penis, among other places, and a bullet was found in his pelvic bones. Law enforcement later found 15 cartridge cases in the bedroom where C.J. was shot.

At 7:30 p.m. on the day of the shooting, A.C. called brother (second jail call). A.C. said that she "handled business." A.C. asked, "[Y]ou know who it is?" Brother responded, "Bam . . . replacing the 'C.'"[2] A.C. said, "[Y]es, bam, bam, that n-gga bam bam." A.C. said, "Let me tell you, bro. Got one up the ass."

Sometime during the call, A.C. told someone in the background to "shut the f--k up, man." Brother asked, "Who the hell is that?" and A.C. responded, "This is Sen." Later, A.C. said, "It was a two-way split by the way. . . . Help, you know what I mean?" Brother said, "Whoever helped you . . . let them know . . . I got them." A voice then said, "What up, man," and brother responded, "Hey, I got you . . . if you ever come to the joint, bro. I got your back, all right? . . . Since you helped my sister, I got you."

The day after the shooting, on December 30, A.C. called brother a third time (third jail call) and said, "I just don't want no loose ends . . . I'm talking about with Seneca . . . I feel like he just knows way too much." Brother said, "I don't even know who the f--k that

_____

[2] C.J.'s first name is Cameron.

5

b-tch is." A.C. said, "It's a n-gga I was f--king with. You know the dude that you talked to on the phone a couple times in the background?" A.C. said, "I don't know if this n-gga's f--king going to try to do something . . . because he f--king pulled out a little gun on me." Brother asked, "Did you give him that thing?" and A.C. replied, "No, he's not no lame ass n-gga. He's got his own sh-t." Brother said, "Why the f--k you even f--king with that n-gga in the first place?" And A.C. said, "Because he's a f--king shooter, that's why."

On December 31, law enforcement located a silver Honda sedan in a parking lot outside the Gateway Towers apartment building. Believing that it was the Honda sedan that C.J. drove to Duluth, they conducted surveillance. Law enforcement observed "two individuals" walk towards the Honda sedan and saw "the female go to the driver's side door and the male to the passenger side door." Law enforcement identified the male as Steeprock and the female as A.C.

Law enforcement arrested A.C. and searched her purse, where they found "a handgun." The gun was later identified as a Walther pistol, which had a "major female DNA profile" matching A.C. The Minnesota Bureau of Criminal Apprehension (BCA) determined that the Walther pistol had fired seven of the 15 cartridge cases found in the bedroom where C.J. was shot.

When Steeprock saw law enforcement, he "started to run." One of the officers chased Steeprock on foot, yelling at Steeprock to "get down on his knees" and "show [the officer] his hands." Steeprock ran across the street behind Gateway Towers and down a hill with "a lot of snow." He stopped at the bottom of the hill, "went down to the ground and put his hands out to the sides." Two officers arrested Steeprock. Other law-enforcement

6

officers, accompanied by a trained canine, searched "the path" that Steeprock had run but did not locate "any other evidence or firearms that may have been involved in [the] case."

On January 1, 2021, A.C. sent the following text message from jail: "Dude is in here telling the cops it was all on me! He took off running 'n was able to dump his gun." A.C. also texted, "Sin took off running n was able to dump his taco so I think he blamin' me."

On January 2, A.C. called a friend from jail (fourth jail call) and said, "He f--king lucky as hell too because he took off running and he had his thing on him, and I think he f--king threw that b-tch when he was running." A.C. told her friend, "I need you to f--king go walk around there and find that n-gga's thing." At trial, an investigator testified that "thing is another term for handgun."

That same day, a law-enforcement canine that "specialized" in "looking for firearms" was transported to Duluth to assist "in looking for a possible firearm." Accompanied by the canine, officers searched the Gateway Towers parking lot, the street behind it, and the hill down which Steeprock ran. In a snowbank by the hill, near where Steeprock was arrested, the canine alerted an officer to a firearm buried in the snow.

Following the arrests of A.C. and Steeprock, the district court issued a warrant permitting the state (a) to search the silver Honda and a Gateway Towers apartment that A.C. and Steeprock had "recently left" before their arrest and (b) to obtain a "DNA Buccal Swab" from Steeprock and A.C. Pursuant to the warrant, the state obtained Steeprock's saliva sample. Much later, as explained below, the state moved for a discovery order under Minn. R. Crim. P. 9.02, subd. 2(1)(f), to obtain another saliva sample from Steeprock. At the same time, the state submitted a letter to the district court stipulating not to use the

7

evidence obtained from the search warrant. The district court granted the state's rule 9.02 discovery motion over Steeprock's objection and the state obtained a second saliva sample from Steeprock.

The BCA performed a forensic analysis of the firearm removed from the snowbank. The firearm—a Taurus pistol—had "a major male DNA profile that matche[d] Seneca Steeprock." The BCA also determined that the Taurus fired eight of the 15 cartridge cases found in the bedroom where C.J. was shot.

The state called 24 witnesses to testify. A.C. did not testify, but the district court received into evidence, over Steeprock's objection, the recordings of A.C.'s four jail calls and her text messages as described above. Steeprock did not testify at trial or call any witnesses. The jury found Steeprock guilty of attempted first-degree murder and unlawful possession of a firearm. The district court sentenced Steeprock to concurrent prison sentences of 240 months and 60 months, respectively.

Steeprock appeals.

## ISSUES

I.     Were Steeprock's constitutional rights violated when the state took a second saliva sample pursuant to a discovery order under rule 9.02, subdivision 2(1)(f)?

II.     Did the district court abuse its discretion by refusing to instruct the jury that accomplice testimony requires corroboration?

III.     Did the district court abuse its discretion by admitting A.C.'s hearsay statements as against her penal interest?

IV.     Should this court grant Steeprock's motion to strike parts of the state's supplemental response brief?

## ANALYSIS

**I.** **Steeprock's constitutional rights were violated when the state took a second saliva sample pursuant to a discovery order under rule 9.02, subdivision 2(1)(f), because the state did not have a valid search warrant.**

Steeprock argues that the "district court violated [his] constitutional rights when it ordered him to permit the taking of a saliva sample" under rule 9.02, subdivision 2(1)(f), "without issuing a probable-cause based search warrant." The state argues that, while "[t]here is no precedential caselaw in Minnesota deciding the constitutionality of a search or seizure" under rule 9.02, subdivision 2(1)(f), "the United States Supreme Court has long recognized that certain limited seizures and searches may be conducted without a probable-cause-to-search finding."

Some additional background helps our review of this issue. As mentioned above, two days after C.J. was shot, the district court granted the state's application for a search warrant permitting the state to obtain a "DNA Buccal Swab" from Steeprock, among other things. The warrant was executed, and the state obtained the buccal swab.

During pretrial proceedings in Steeprock's case, the state moved the district court for an order "requiring [Steeprock] to permit the taking of saliva" under rule 9.02, subdivision 2(1)(f), "for the purposes of comparative DNA analysis." The state argued that Steeprock's DNA sample would "materially aid in determining whether [Steeprock] committed the offense as charged." The state's motion outlined alleged facts and did not include affidavits or statements under oath or refer to the earlier search warrant.

On the same day that it filed the rule 9.02 motion, the state filed a letter with the district court stating that A.C. had challenged the search warrant in her case and that, as a

9

result, the state agreed not to use the evidence obtained from the warrant "in the prosecution of the matter."[3] The state's letter added that it was "making the same stipulation" in Steeprock's case. Steeprock opposed the state's request for a second saliva sample, arguing that the state "failed to follow appropriate constitutional limitations" under rule 9.02, which "should not be used as a work around for defective search warrants as proposed by the State in this case." Steeprock urged that to allow the state to obtain "his DNA without a search warrant would be prejudicial error."

After a hearing, the district court decided to "grant to the State's motion" and issued an order directing Steeprock to provide a saliva sample under rule 9.02, subdivision 2(1)(f). The district court concluded that "obtaining a DNA sample will materially aid in determining whether Defendant Steeprock possessed the gun and committed the charged offense." The district court also determined that "the evidence that State stipulated that it would not use was one buccal swab of Steeprock's DNA." The district court's order did not discuss whether a search warrant was required for the second saliva sample or determine that probable cause supported a warrant.

With this background in mind, we consider the following: whether a search occurred and a valid search warrant was required, whether Steeprock's DNA evidence should be suppressed, and whether reversal is necessary.

---

[3] The record briefly indicates that A.C. challenged the search warrant under *Franks v. Delaware*, 438 U.S. 154 (1978). *See State v. Anderson*, 784 N.W.2d 320, 327 (Minn. 2010) (stating that a *Franks* challenge requires the defendant to show that a search-warrant application "includes intentional or reckless misrepresentations of fact material to the findings of probable cause").

**A.** **When the state obtained Steeprock's saliva sample pursuant to a discovery order under rule 9.02, subdivision 2(1)(f), it conducted a search under the Fourth Amendment.**

Steeprock argues that when the state took Steeprock's second saliva sample "for comparative DNA analysis," it was "a search." The state concedes that a search occurred. The district court's discovery order did not explicitly discuss this question but stated that "a court can order a defendant to provide a DNA sample" and cited Minn. R. Crim. P. 9.02, subd. 2(1), which provides:

> On the prosecutor's motion, with notice to the defense and a showing that one or more of the discovery procedures described below will materially aid in determining whether the defendant committed the offense charged, the court before trial may, subject to constitutional limitations, order a defendant to: . . .
> (f) Permit the taking of blood, hair, saliva, urine, or samples of other bodily materials that do not involve unreasonable intrusion, but the court must not permit a blood sample to be taken except on a showing of probable cause to believe that the test will aid in establishing the defendant's guilt[.]

Caselaw from the United States Supreme Court and the Minnesota appellate courts has considered whether taking biological samples from a defendant is a search. In *Maryland v. King*, the United States Supreme Court held that "using a buccal swab on the inner tissues of a person's cheek in order to obtain DNA samples is a search."[4] 569 U.S. 435, 446 (2013) (holding that a state law requiring arrestees to provide a buccal swab is "a reasonable search that can be considered part of a routine booking procedure"). The

---

[4] A buccal swab "involves wiping a small piece of filter paper or a cotton swab similar to a Q-tip against the inside cheek of an individual's mouth to collect some skin cells." *Maryland v. King*, 569 U.S. 435, 444 (2013).

11

Minnesota Supreme Court has analyzed the postconviction collection of a defendant's biological specimens for DNA analysis based on a court's sentencing order as a search under the Fourth Amendment. *State v. Bartylla*, 755 N.W.2d 8, 14 (Minn. 2008) (upholding the constitutionality of Minn. Stat. § 609.117 (2002)).[5] This court has also ruled that "taking and analyzing biological specimens . . . is a search under the Fourth Amendment." *In re Welfare of C.T.L.*, 722 N.W.2d 484, 488 (Minn. App. 2006) (holding that a state law violated the constitutional search-warrant requirement by authorizing a district court to order a juvenile to provide a biological specimen after a probable-cause determination on the charge).

The legislature and the Minnesota Supreme Court have agreed in the driving-while-impaired context that the taking of some biological specimens is a search requiring a warrant. For example, in the driving-while-impaired context, blood and urine tests "may be conducted only pursuant to a search warrant . . . or a judicially recognized exception to the search warrant requirement." Minn. Stat. § 169A.51, subd. 3 (2020); *see also State v. Thompson*, 886 N.W.2d 224, 233 (Minn. 2016) (concluding that "conducting

---

[5] Two recent Minnesota Supreme Court cases have recognized circumstances in which obtaining a defendant's DNA was not a search. These cases are readily distinguishable. In *State v. Carbo*, the supreme court held that "a Fourth Amendment search did not occur" when police performed "a genetic analysis" of the semen Carbo "left behind at the crime scene." 6 N.W.3d 114, 122 (Minn. 2024). In *State v. Westrom*, the supreme court determined that the police's DNA analysis of a napkin Westrom used and discarded "was not a search." 6 N.W.3d 145, 154 (Minn. 2024). The supreme court explained that "the police had lawfully acquired possession of the napkin" by taking it out of a trash can at a hockey game and "did not extract from it information beyond the equivalent of a genetic 'fingerprint.'" *Id.* at 151-52, 154. These cases involved DNA evidence that the defendant abandoned and therefore do not guide our analysis here.

a blood or urine test without a warrant violates the Fourth Amendment"); *State v. Trahan*, 886 N.W.2d 216, 221 (Minn. 2016) (holding "that the Fourth Amendment prohibits convicting Trahan for refusing the blood test requested of him absent the existence of a warrant or exigent circumstances").

We therefore conclude that a search occurred when the state obtained Steeprock's saliva sample pursuant to a court order under rule 9.02, subdivision 2(1)(f).

**B      The warrantless search of Steeprock's saliva violated his constitutional rights.**

The United States and Minnesota Constitutions prohibit unreasonable searches and seizures and require that search warrants be issued only "upon probable cause, supported by oath or affirmation." U.S. Const. amend. IV; Minn. Const. art. I, § 10. Whether a search was unreasonable is a legal question that appellate courts review de novo. *State v. Eichers*, 853 N.W.2d 114, 124 (Minn. 2014).

We begin by noting that the discovery rule that the state used to obtain Steeprock's saliva sample incorporates constitutional requirements. Minnesota Rule of Criminal Procedure 9.02, subdivision 2(1), provides that the discovery procedures outlined in the rule are "subject to constitutional limitations." The rule does not specify what these constitutional limitations are, and neither this court nor the supreme court has addressed this issue.

"A search is presumptively unreasonable unless it is conducted under a valid warrant or a specific exception to the warrant requirement applies." *State v. McNeilly*, 6 N.W.3d 161, 175 (Minn. 2024). A warrant "must be supported by probable cause." *State*

*v. Rochefort*, 631 N.W.2d 802, 804 (Minn. 2001) (first citing U.S. Const. amend. IV; and then citing Minn. Const. art. I, § 10). "Probable cause exists when there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Onyelobi v. State*, 932 N.W.2d 272, 281 (Minn. 2019) (quotation omitted). Whether probable cause existed to support a warrantless search is a question of law that we review de novo. *Rochefort*, 631 N.W.2d at 805.

In his initial brief to this court, Steeprock argues that the district court erred by ordering him to provide a saliva sample under rule 9.02, subdivision 2(1)(f), without a valid search warrant. Steeprock argues that rule 9.02, subdivision 2(1)(f), "authorizes an unconstitutional warrantless search on less than probable cause" and that the rule's "materially aid" standard fails to satisfy the probable-cause requirement for a search. Minn. R. Crim. P. 9.02, subd. 2(1)(f). But Steeprock also contends that rule 9.02, subdivision 2(1), explicitly incorporates constitutional requirements and urges us to conclude that the constitutions require that a search warrant be issued before a court may order a defendant to provide a saliva sample under the rule. The state appears to argue that rule 9.02, subdivision 2(1)(f), is an exception to the warrant requirement.

While neither party cited the United States Supreme Court opinion in *King*, we turn to it for guidance because it considered the constitutionality of Maryland's law requiring the collection of DNA via a buccal swab of "an individual who is charged with . . . a crime of violence."[6] 569 U.S. at 443-44. The Supreme Court, as noted above, held that the taking

---

[6] Maryland's DNA-collection law also provided that the DNA sample should not be placed in a database before the defendant's arraignment and that, if the district court determined

14

of saliva was a search and then assessed whether the search was reasonable under the Fourth Amendment. *Id*. at 446. The Court reasoned that Maryland had a "significant state interest[] in identifying [the defendant] not only so that the proper name can be attached to his charges but also so that the criminal justice system can make informed decisions concerning pretrial custody." *Id.* at 465. The Supreme Court determined that, in comparison to the government's "significant" interest in identifying arrestees, "the intrusion of a cheek swab to obtain a DNA sample is a minimal one."[7] *Id.* at 461. Accordingly, the Supreme Court upheld Maryland's DNA-collection law as a reasonable search and reversed the lower court ruling that had set aside King's conviction as based on an unconstitutional search.[8] *King*, 569 U.S. at 441.

---

that the charges against the defendant were not supported by probable cause, then the DNA sample must be destroyed. *King*, 569 U.S. at 443.

[7] The Supreme Court compared Maryland's DNA-collection law to "the familiar practice of fingerprinting arrestees," which "courts had no trouble determining . . . was a natural part of the administrative steps incident to arrest." *Id.* at 458 (quotation omitted). The Supreme Court concluded that, "[w]hen officers make an arrest supported by probable cause to hold for a serious offense and bring the suspect to the station to be detained in custody," using a buccal swab to obtain the arrestee's DNA is, "like fingerprinting and photographing, a legitimate police booking procedure that is reasonable under the Fourth Amendment." *Id.* at 465-66.

[8] Seven years before the Supreme Court's decision in *King,* this court considered the constitutionality of Minn. Stat. § 299C.105 (Supp. 2005), which required "law-enforcement personnel to take biological specimens from juveniles and adults who have had a probable-cause determination on a charged offense but who have not been convicted." *C.T.L.*, 722 N.W.2d at 486, 488. We held that, absent an exception to the warrant requirement, "before taking a biological specimen from a person for the purpose of DNA analysis, law-enforcement personnel must obtain a search warrant based on a neutral and detached magistrate's determination that there is a fair probability that taking the specimen will produce evidence of a crime." *Id.* at 485. We noted that "the privacy interest of a person who has been charged with a criminal offense, but who has not been

15

The Supreme Court in *King* did not directly address the argument that Steeprock makes here—that a search warrant is required before the state may take a saliva sample from a defendant when the state expressly requests the sample in order to compare the defendant's DNA with the DNA on a weapon involved in the crime charged. Both the Maryland DNA-collection law and Minn. R. Crim. P. 9.02, subd. 2(1)(f), authorized the same physical intrusion—the taking of a saliva sample. But the state's purpose and use of the saliva sample in *King* differed greatly from the circumstances here. The Supreme Court emphasized that Maryland's DNA-collection law was limited to establishing an arrestee's identity for booking and pretrial custody.[9] *Id.* at 450, 453 (explaining the state's interest in knowing "who has been arrested" and whether the arrestee poses a danger to the public).

Minnesota Rule of Criminal Procedure 9.02, subdivision 2(1)(f), allows the state to obtain a court discovery order to take a saliva sample from a defendant if it "will materially aid in determining whether the defendant committed the offense charged." In Steeprock's case, the saliva sample was not used for identification like the buccal swab in *King*. Rather, the saliva sample taken from Steeprock was the basis for the state's forensic testimony that matched Steeprock's DNA to the DNA retrieved from one of the guns used to shoot C.J.

---

convicted, is not outweighed by the state's interest in taking a biological specimen from the person for the purpose of DNA analysis." *Id.* at 492.

[9] It is true that the DNA collected from King in 2009 matched DNA in a database that included DNA collected from a 2003 offense. *Id*. But law enforcement then "obtained a search warrant and took a second sample of DNA from King, which again matched the evidence from" the 2003 offense. *Id*.

Because the state's express purpose for obtaining Steeprock's DNA was different, *King* is distinguishable.[10]

Driving-while-impaired caselaw instructs that the state's purpose for obtaining a biological sample is relevant in determining the reasonableness of a warrantless search. When considering whether constitutional search requirements apply to blood tests of drunk-driving suspects, the United States Supreme Court has stated that "a compelled physical intrusion beneath [a defendant's] skin and into his veins to obtain a sample of his blood *for use as evidence in a criminal investigation . . .* implicates an individual's most personal and deep-rooted expectations of privacy." *Missouri v. McNeely*, 569 U.S. 141, 148, 165 (2013) (emphasis added) (quotation omitted).

We conclude that taking a defendant's saliva sample under rule 9.02, subdivision 2(1)(f), to determine whether the defendant's DNA is on a weapon involved in the crime charged is similar to conducting blood and urine tests to obtain confirmatory evidence of driving while impaired. We also specifically reject the state's apparent argument that rule 9.02, subdivision 2(1), provides an exception to the warrant requirement, because the language of the rule specifies that the discovery order is "subject to constitutional limitations." Both the federal and state constitutions therefore require that the state must obtain a valid search warrant based on probable cause before taking a defendant's saliva sample under rule 9.02, subdivision 2(1).

---

[10] Also, in *King*, the state took a second DNA sample from King pursuant to a warrant. *Id.* at 441. The state took a second saliva sample from Steeprock under rule 9.02 and without a valid search warrant.

The state did not apply for a search warrant when it moved under rule 9.02 for Steeprock's saliva sample. The state's brief to this court does not rely on the previously issued search warrant—which it stipulated that it would not use—to support the order directing Steeprock's saliva sample under rule 9.02. Rather, the state appears to argue that the district court effectively made a probable-cause determination when it found that obtaining a saliva sample from Steeprock "would show evidence of a crime." In Steeprock's reply brief, he disagrees, arguing that the district court did not make a finding of probable cause and instead used the "materially aid" standard from rule 9.02, subdivision 2(1).

The record does not support the state's assertion that the district court made a probable-cause determination when granting the state's motion under rule 9.02, subdivision 2(1)(f). The district court's order stated that it was granting the state's motion "[b]ecause obtaining a sample of Steeprock's DNA will materially aid in determining whether he committed the charged offense." The materially-aid determination is different from a determination of probable cause for a warrant, which requires a fair probability that evidence of a crime will be found in Steeprock's saliva sample.[11] Thus, because the state took Steeprock's saliva sample under rule 9.02, subdivision 2(1)(f), without obtaining a valid search warrant, we conclude that the state violated Steeprock's constitutional rights.

---

[11] Our analysis on this point is similar to our reasoning in *C.T.L.*, in which we concluded that "a determination of probable cause to support a criminal charge, even if it is made by a judge, is not sufficient to permit a biological specimen to be taken from the person charged without a warrant." 722 N.W.2d at 490.

**C.**     **Steeprock's saliva sample obtained under rule 9.02, subdivision 2(1)(f), without a warrant should have been suppressed.**

Because the state violated Steeprock's constitutional rights when it obtained Steeprock's DNA under rule 9.02, subdivision 2(1)(f), without a warrant, we consider whether this DNA evidence should be suppressed. *See State v. Malecha*, 3 N.W.3d 566, 571 (Minn. 2024) (considering whether to apply the exclusionary rule after determining an unconstitutional search occurred). The United States Constitution does not identify—nor does the Minnesota Constitution—"the remedy available in the event of an unreasonable search or seizure." *Id.* at 572. Accordingly, the United States Supreme Court created the exclusionary rule, "a prudential doctrine" designed "to compel respect for the constitutional guaranty" of freedom from unreasonable searches and seizures. *Davis v. United States*, 564 U.S. 229, 236 (2011) (quotations omitted). The exclusionary rule allows for suppression of evidence obtained in violation of this constitutional guaranty. *Id.* But the Supreme Court has "rejected the argument that exclusion is a necessary consequence of a Fourth Amendment violation." *Herring v. United* States, 555 U.S. 135, 141 (2009). The Supreme Court has stated that "the *sole* purpose of the exclusionary rule is to deter misconduct by law enforcement" and has "repeatedly rejected efforts to expand the focus of the exclusionary rule beyond deterrence of culpable police conduct." *Davis*, 564 U.S. at 246.

The Minnesota Supreme Court has similarly stated that "the exclusionary rule in Minnesota, like the federal exclusionary rule, does not require automatic suppression of evidence obtained by unlawful means," and has "identified deterrence of police misconduct

as the central purpose of the exclusionary rule." *State v. Lindquist*, 869 N.W.2d 863, 871-72 (Minn. 2015). But unlike the United States Supreme Court, which "has declined to consider any reason justifying exclusion beyond deterrence," the Minnesota Supreme Court "has never used such absolute language, instead emphasizing that deterrence is *a* purpose, but not the *only* purpose, of exclusion." *Malecha*, 3 N.W.3d at 577 n.4; *see, e.g.*, *State v. Lucas*, 372 N.W.2d 731, 737 (Minn. 1985) (declining to apply the exclusionary rule where suppression of the evidence would "not serve to deter misconduct by police officers" and admission of the evidence would "not compromise judicial integrity").

Recently, in *Malecha*, the Minnesota Supreme Court applied the exclusionary rule to evidence obtained when Malecha was illegally arrested under a quashed arrest warrant. 3 N.W.2d at 569. "Because of a clerical error by court administration, . . . the district court's order quashing the warrant was not transmitted to law enforcement" who arrested Malecha and discovered methamphetamine during a search incident to arrest. *Id.* "[I]n addition to the central object of deterring unlawful *police* conduct," the supreme court recognized "other purposes" served by the exclusionary rule, "including the related goal of more generally deterring unlawful *government* conduct" such as negligent misconduct. *Id.* at 578. The supreme court determined that the exclusionary rule applied and reinstated the district court's order suppressing the methamphetamine and dismissing the charges. *Id.* at 579.

The state's brief to this court argues that the inevitable-discovery and good-faith exceptions to the exclusionary rule apply. We discuss these exceptions in turn.

## 1.    Inevitable-Discovery Exception

Under the inevitable-discovery exception, "[i]f the state can establish by a preponderance of the evidence that the fruits of a challenged search ultimately or inevitably would have been discovered by lawful means, then the seized evidence is admissible even if the search violated the warrant requirement." *State v. Licari*, 659 N.W.2d 243, 254 (Minn. 2003) (quotation omitted). To meet its burden under the inevitable-discovery exception, the state's showing must "involve[] no speculative elements but focus[] on demonstrated historical facts capable of ready verification." *Nix v. Williams*, 467 U.S. 431, 444 n.5 (1984).

Here, the district court's order granting the state's motion to obtain Steeprock's saliva sample under rule 9.02, subdivision 2(1)(f), determined that the inevitable-discovery exception applied because "Steeprock's DNA profile is the same . . . as it was when the earlier buccal swab was collected as it was when Steeprock allegedly committed the offense." The state urges us to adopt the district court's analysis. Steeprock counters that "[n]othing in the inevitable-discovery doctrine allows the state to save an illegal search with a second illegal search."

While the record does not support Steeprock's claim that the previously issued search warrant was "illegal," we nonetheless conclude that the inevitable-discovery exception does not apply. As noted above, the inevitable-discovery exception applies to evidence that "inevitably would have been discovered by *lawful means*." *Licari*, 659 N.W.2d at 254 (emphasis added). The district court's determination that the state would have inevitably obtained Steeprock's DNA because DNA is unchanging does not

21

address whether the state had lawful means to obtain the DNA—for example, whether the state had probable cause to secure a warrant for Steeprock's DNA.

The state argues that Steeprock's saliva sample "can be obtained lawfully with a search warrant instead of a rule 9.02 order" because there was "a fair probability" that the saliva sample "would contain evidence of [a] crime." We reject this argument for two reasons. First, we repeat our earlier observation that the state does not argue that probable cause supports the rule 9.02 order based on the warrant issued at the outset of this case. Also, the district court's rule 9.02 order did not determine that probable cause supported the taking of the saliva sample.

Second, the record does not support an appellate determination of probable cause.[12] As noted above, a valid warrant must be based "upon probable cause supported by oath or affirmation." U.S. Const. amend. IV; Minn. Const. art. I, § 10. The state's rule 9.02 motion merely summarized alleged facts without submitting any evidence, such as an affidavit. *See Nix*, 467 U.S. at 444 n.5 (stating that application of the inevitable-discovery exception cannot be based on "speculative elements"); *State v. Dotson*, 900 N.W.2d 445, 453 (Minn. App. 2017) (declining to apply the inevitable-discovery doctrine based on "mere speculation" that law enforcement would have lawfully obtained the evidence).

On this record, the state has not met its burden to show that Steeprock's DNA "inevitably would have been discovered by lawful means." *Licari*, 659 N.W.2d at 254-55

---

[12] Because the record here does not support an appellate determination of probable cause, we reject the state's reliance on *In re Welfare of J.W.K.*, 583 N.W.2d 752, 757 (Minn. 1998) (determining that the record "was sufficient to establish probable cause to search" under the inevitable-discovery exception).

(declining to apply the inevitable-discovery exception and remanding for factual findings because the district court did not consider "several factual issues crucial to inevitable discovery"); *see also State v. Diede*, 795 N.W.2d 836, 849 (Minn. 2011) (determining that the "facts of [the] case do not show that the police would inevitably have discovered" the illegally obtained evidence based on "probable cause to arrest" the defendant); *State v. Hatton*, 389 N.W.2d 229, 234 (Minn. App. 1986) (describing the inevitable-discovery exception as "narrow" and refusing to apply it broadly because that "would render the Fourth Amendment protection meaningless"), *rev. denied* (Minn. Aug. 13, 1986). We therefore decline to apply the inevitable-discovery exception to the exclusionary rule.

### 2. Good-Faith Exception

The Minnesota Supreme Court has recognized the good-faith exception to the exclusionary rule in unconstitutional-search and -seizure cases "in only one limited circumstance." *Malecha*, 3 N.W.3d at 574. In *Lindquist*, law enforcement obtained a warrantless blood sample from Lindquist, who was the driver in an accident and failed field sobriety tests. 869 N.W.2d at 865. Lindquist appealed her conviction and argued that the blood sample should be excluded as a warrantless search; the state contended that the good-faith exception applied. *See id.* at 866.

In its opinion, the Minnesota Supreme Court recognized that two appellate decisions, "which were binding at the time of Lindquist's arrest," "justified a warrantless blood draw" based on the "natural dissipation of alcohol in the blood." *Id.* at 877-78 (quotation omitted). But, while Lindquist's direct appeal was pending, the United States Supreme Court "held that the rapid dissipation of alcohol in the body did not, by itself,

23

establish that there were exigent circumstances justifying a warrantless blood draw from a suspected drunk driver." *Id* at 866 (citing *McNeely*, 569 U.S. at 145). The Minnesota Supreme Court determined that *McNeely* "overruled [its] precedent," but also declined to suppress the evidence of Lindquist's blood draw, stating that "the exclusionary rule does not apply to violations of the Fourth Amendment to the U.S. Constitution, or Article I, Section 10, of the Minnesota Constitution when law enforcement acts in objectively reasonable reliance on binding appellate precedent." *Id.* at 866, 876. The supreme court noted that "the binding precedent must specifically authorize the behavior. Law enforcement cannot extend the law to areas in which no precedent exists or the law is unsettled." *Id.* at 876-77 (quotation omitted). Since *Lindquist*, the Minnesota Supreme Court has "declined to extend the good-faith exception." *Malecha*, 3 N.W.3d at 574.

Here, the state argues that the "good-faith exception applies because the district court and prosecutors reasonably relied on rule 9.02." We are not persuaded because the discovery procedures outlined in rule 9.02 are "subject to constitutional limitations." Minn. R. Crim. P. 9.02, subd. 2(1). Also, neither the rule nor binding appellate precedent addresses these limitations, which distinguishes this case from the application of the good-faith exception in *Lindquist*. 869 N.W.2d at 876-77. Thus, the constitutional limitations in rule 9.02 are an unsettled area of law, and the good-faith exception, as recognized in Minnesota, does not apply.

In sum, the record and caselaw do not support the application of the above two exceptions to the exclusionary rule. Further, the Minnesota Supreme Court has applied the exclusionary rule to circumstances that would deter unlawful government conduct, not just

unlawful *police* conduct. *Malecha*, 3 N.W.3d at 578. We therefore conclude that the state's evidence that Steeprock's DNA matched the DNA on one of the guns used to shoot C.J. should have been suppressed because Steeprock's saliva sample was obtained without a valid search warrant.

### D. The violation of Steeprock's constitutional rights was not harmless beyond a reasonable doubt.

Because we conclude that the state's DNA evidence should have been suppressed, we consider whether the admission of the DNA evidence during Steeprock's jury trial was prejudicial and requires reversal of Steeprock's convictions. "When determining whether a defendant was prejudiced by the admission of evidence that should have been excluded, [appellate courts] apply one of two different harmless-error tests." *McNeilly*, 6 N.W.3d at 189. "When the error does not implicate a constitutional right, a new trial is required only when" the wrongfully admitted evidence "substantially influenced the jury's verdict." *State v. Sanders*, 775 N.W.2d 883, 887 (Minn. 2009). "But when the error implicates a constitutional right, [appellate courts] employ a heightened standard and ask whether the error was harmless beyond a reasonable doubt." *McNeilly*, 6 N.W.3d at 189.

For an error to be harmless beyond a reasonable doubt, "the guilty verdict . . . must be surely unattributable to the error." *State v. Shoen*, 598 N.W.2d 370, 377 (Minn. 1999) (quotation omitted). "When determining whether a jury verdict was surely unattributable to an erroneous admission of evidence, [appellate courts] consider the manner in which the evidence was presented, whether it was highly persuasive, whether it was used in closing argument, and whether it was effectively countered by the defendant." *Sanders*,

25

775 N.W.2d at 888 (quotation omitted). If the error implicating a constitutional right was not harmless beyond a reasonable doubt, then appellate courts "will award a new trial." *State v. Lee*, 929 N.W.2d 432, 440 (Minn. 2019) (quotation omitted).

Steeprock urges us to "reverse [his] convictions and remand for a new trial" because the DNA evidence was "highly persuasive" evidence of the "identity of the second shooter," the prosecuting attorney "repeatedly relied on the DNA evidence during closing and rebuttal arguments," and "Steeprock had no way to effectively counter the evidence." The state disagrees, arguing that the district court's error was harmless because "one of the guns used in the shooting was found right where [Steeprock] was apprehended" and A.C. "named [Steeprock] as her accomplice." We are not persuaded by the state's argument.

No witness testified about who shot C.J., and no evidence—apart from the DNA evidence—placed Steeprock at the crime scene. The DNA in Steeprock's saliva sample was compared to the DNA found on the Taurus pistol recovered near where Steeprock was arrested. Two forensic scientists from the BCA testified that the Taurus pistol fired eight of the 15 cartridge cases found in the bedroom where C.J. was shot and that the DNA on the Taurus pistol matched Steeprock's DNA in the saliva sample. The prosecuting attorney referred to Steeprock's DNA on the pistol twice in the initial closing argument and twice during rebuttal argument.

Steeprock's attorney tried to counter the DNA evidence on cross-examination of the forensic scientists and in closing argument. Steeprock's attorney pointed out that the state's evidence did not show where Steeprock's DNA was found on the pistol and that forensic analysis showed that the swab taken from the pistol contained a mixture of DNA from three

26

or more other individuals. But on rebuttal, the prosecuting attorney noted that Steeprock's theory of the case required the jury to believe that "many coincidences" made Steeprock "the victim of the most unfortunate set of circumstances."

In short, the DNA evidence was persuasive and central to the state's case against Steeprock. *See State v. Garland*, 942 N.W.2d 732, 741 (Minn. 2020) (stating that "DNA evidence may be strong and persuasive to a jury"). Thus, we cannot conclude that the jury's verdict was surely unattributable to the DNA evidence obtained based on the district court's rule 9.02 order for Steeprock's saliva sample. The error in admitting such evidence was not harmless beyond a reasonable doubt, and Steeprock is entitled to a new trial. *See Lee*, 929 N.W.2d at 440 ("When an error implicates a constitutional right, we will award a new trial unless the error is harmless beyond a reasonable doubt." (quotation omitted)); *State v. Weaver*, 733 N.W.2d 793, 802 (Minn. App. 2007) (determining that appellant was "entitled to a new trial" where the erroneous admission of laboratory test results "surely influenced the verdict in some way"), *rev. denied* (Minn. Sept. 18, 2007).

We therefore reverse Steeprock's conviction and remand for a new trial. We note that this opinion does not preclude the state on remand from seeking to obtain Steeprock's DNA for analysis based on a valid search warrant.

II. **The district court did not abuse its discretion by refusing to instruct the jury that accomplice testimony requires corroboration because "testimony" in section 634.04 refers to statements under oath.**

Steeprock argues that "the district court erred by denying [his] motion to instruct the jury, in accordance with section 634.04, that it could not find Steeprock guilty based upon" A.C.'s uncorroborated statements in the jail calls and jail text messages. Because

this issue is likely to arise again in a new trial, we consider the parties' arguments. *See State v. Logan*, 535 N.W.2d 320, 325 (Minn. 1995) (addressing "issues raised by defendant on appeal that may arise on retrial"); *State v. Hunter*, 857 N.W.2d 537, 543 (Minn. App. 2014) (addressing an issue raised by a defendant "in the interests of judicial economy because it will likely arise again on remand"). Appellate courts review a district court's decision about jury instructions for an abuse of discretion. *State v. Mahkuk*, 736 N.W.2d 675, 682 (Minn. 2007).

During trial and outside the presence of the jury, the parties argued about whether the district court should instruct the jury that it could not convict Steeprock based on the uncorroborated out-of-court statements of Steeprock's accomplice, A.C., who did not testify at trial. Steeprock argued that the accomplice-testimony instruction should apply to an accomplice's "out-of-court statements." The state disagreed, contending that testimony is "an in-court under oath statement." The district court denied Steeprock's request and explained that, "[w]ithout further direction from the appellate courts," it would not "give the instruction."

Under Minn. Stat. § 634.04, a "conviction cannot be had upon the testimony of an accomplice, unless it is corroborated by such other evidence as tends to convict the defendant of the commission of the offense, and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof."[13] The state does not dispute that A.C. was Steeprock's accomplice.

---

[13] Minnesota's pattern jury instructions incorporate the relevant statute and instruct the jury, "You may not find the defendant guilty of a crime on the basis of the testimony of an

Whether "testimony" as used in section 634.04 includes an accomplice's out-of-court statements is a question of first impression that requires statutory interpretation. Appellate courts review a question of statutory interpretation de novo. *State v. Loveless*, 987 N.W.2d 224, 244 (Minn. 2023). The goal of statutory interpretation "is to ascertain and effectuate the intent of the Legislature." *State v. Robinson*, 921 N.W.2d 755, 758 (Minn. 2019) (quotation omitted).

When interpreting a statute, appellate courts begin "by considering whether the statutory language at issue is ambiguous." *State v. Holl*, 966 N.W.2d 803, 808 (Minn. 2021). "A statute is ambiguous when the disputed language is subject to more than one reasonable interpretation." *Roberts v. State*, 945 N.W.2d 850, 853 (Minn. 2020). If the language is not ambiguous, appellate courts "abide by the plain language of the statute," but if the language is ambiguous, appellate courts "use the applicable canons of construction to ascertain the statute's meaning." *Holl*, 966 N.W.2d at 808.

Steeprock argues that "testimony," as used in section 634.04, is ambiguous because it "is not defined in the statute" and "there is no one, single definition of the word 'testimony'" in the dictionary. Steeprock also argues that "the legislature recognized that accomplices are untrustworthy" and thus "to allow convictions based on uncorroborated out-of-court accomplice statements but disallow convictions based upon uncorroborated in-court accomplice statements . . . is backwards." The state argues that section 634.04 "uses 'testimony' in its legal sense" to refer to statements under oath. While the state does

---

accomplice unless that testimony is corroborated by other evidence that tends to convict the defendant of the crime." 10 *Minnesota Practice*, CRIMJIG 3.07 (2023).

not explicitly contend that "testimony" as used in section 634.04 is unambiguous, we understand its brief to make this point implicitly.

Section 634.04 does not define the word "testimony." "When a statute does not define a specific phrase or word, [appellate courts] often look to dictionary definitions." *Robinson*, 921 N.W.2d at 760. Appellate courts generally construe words "according to their common and approved usage," but "technical words . . . are construed according to [their] special meaning." *State v. Bradley*, 4 N.W.3d 105, 112-13 (Minn. 2024) (quotations omitted) (determining that, in Minnesota's statute proscribing multiple convictions for included offenses of the crime charged, "the only reasonable interpretation of the term 'degree' . . . is the technical meaning referring to the ordinally numbered degrees found throughout the criminal code"). To determine "whether words in a statute have a technical meaning or an ordinary meaning, [appellate courts] look at the context in which the phrase appears." *Id.* at 112 (quotation omitted). "A word has a special meaning if courts have ascribed a well-established and long-accepted meaning to it." *State v. Jonsgaard*, 949 N.W.2d 161, 164, 167-69 (Minn. App. 2020) (concluding that "the special, technical meaning" applied to the word "endorse" as used in a check-forgery statute).

"Testimony" is a technical legal term in section 634.04, which governs convictions and indicates that the relevant context is testimony in a courtroom. In the context of a courtroom, "testimony" means "[e]vidence that a competent witness under oath or affirmation gives at trial or in an affidavit or deposition." *Black's Law Dictionary* 1778 (11th ed. 2019). Even nonlegal dictionary definitions give a special meaning to the word "testimony." *See, e.g.*, *The American Heritage Dictionary of the English Language* 1799

30

(5th ed. 2018) (defining "testimony" as "[a] declaration by a witness under oath"); *Testimony*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/testimony [https://perma.cc/H8E2-EXS7] (defining "testimony" as a "solemn declaration usually made orally by a witness under oath").[14]

Caselaw also supports interpreting the term "testimony" according to its technical and legal meaning. In *State v. Davenport*, Davenport and two accomplices were charged with murder. 947 N.W.2d 251, 257 (Minn. 2020). One accomplice pleaded guilty and implicated Davenport in his plea-hearing testimony, which "was admitted as substantive evidence and read aloud" at Davenport's jury trial. *Id.* Davenport challenged the district court's failure to instruct the jury on the corroboration required for accomplice testimony. *Id.* at 260. Although the supreme court declined to decide the meaning of "testimony" under section 634.04, it concluded that the accomplice's plea-hearing testimony was "'testimony' for the purpose of section 634.04."[15] *Davenport*, 947 N.W.2d at 262 & n.7. The supreme court noted that the accomplice "gave his plea hearing testimony *under oath*

---

[14] We acknowledge that other nonlegal definitions of "testimony" ascribe a broader meaning. *See, e.g.*, *The American Heritage Dictionary of the English Language* 1799 (5th ed. 2018) (providing another definition of "testimony" as "[e]vidence in support of a fact or assertion"). But these definitions are not in the context of courtroom testimony.

[15] In *State v. Henderson*, the supreme court also declined to decide the meaning of "testimony," as used in section 634.04, when Henderson challenged the district court's refusal to give an accomplice-testimony instruction for a witness's testimony about the out-of-court statements of Henderson's accomplice. 620 N.W.2d 688, 700-01 (Minn. 2001). The supreme court determined that it "need not decide whether section 634.04 applies to out-of-court statements by an accomplice" because "[e]ven if the court erred in not giving the instruction . . . any error is harmless." *Id.* at 701.

during a court proceeding." *Id*. (emphasis added). Thus, the supreme court's ruling in *Davenport* applied section 634.04 to statements under oath.

The statutory scheme also provides another layer of relevant context and supports applying the technical meaning of "testimony." Section 634.04 is part of chapter 634, which is titled "Evidence; Witnesses." Other sections of chapter 634 refer to hearings or trials. This statutory scheme suggests that "testimony" should be interpreted within the context of courtroom or legal proceedings. *See, e.g.*, Minn. Stat. §§ 634.25 ("In a civil or criminal trial or hearing, the results of DNA analysis . . . are admissible in evidence without antecedent expert testimony that DNA analysis provides a trustworthy and reliable method . . . ."), .36 ("In any hearing or trial of a criminal offense or petty misdemeanor . . . evidence of a videotape . . . prepared by a peace officer . . . while in the performance of official duties shall not be excluded on the ground that a written transcript . . . was not prepared . . . .") (2020). In the context of legal proceedings, "testimony" means one thing: statements under oath.

Because the goal of statutory interpretation is to give effect to legislative intent, we also examine that aspect of section 634.04. The supreme court has noted that "the rationale" for section 634.04 "is that the credibility of an accomplice is inherently untrustworthy." *State v. Strommen*, 648 N.W.2d 681, 689 (Minn. 2002); *see State v. Azzone*, 135 N.W.2d 488, 493 (Minn. 1965) (stating that one object of section 634.04 "is to provide a check upon the credibility of testimony of a person who, having been admittedly involved in criminal conduct, might be disposed to shift or diffuse responsibility"). By interpreting

"testimony," as used in section 634.04, to mean statements under oath, we are giving effect to the legislature's intent to place a check upon accomplice credibility.

The supreme court has stated that "arguably the same concerns regarding reliance on accomplice testimony exist regardless of the form in which the statements are presented to the jury." *Henderson*, 620 N.W.2d at 695, 701. We recognize that the consequence of interpreting "testimony" to be statements under oath means that no corroboration is required for an accomplice's out-of-court statements—which are not subject to cross-examination and are arguably less reliable.

We conclude, however, that section 634.04 unambiguously refers to "testimony," a technical legal term that means statements under oath. We will not "add words . . . to an unambiguous statute." *State v. Expose*, 872 N.W.2d 252, 259 (Minn. 2015) (quotation omitted). Nor will we "re-write an unambiguous statute to conform to what may be the Legislature's intent." *State v. Struzyk*, 869 N.W.2d 280, 288 n.5 (Minn. 2015). While expanding section 634.04 to include out-of-court statements may be consistent with the legislature's intent, we defer to the legislature to consider this question and make any necessary amendments.

In short, we conclude that "testimony" in section 634.04 unambiguously refers to statements made under oath. Because A.C.'s recorded statements were made out of court and were not under oath, they are not testimony under section 634.04. Thus, the district court did not abuse its discretion by refusing to instruct the jury that out-of-court statements by an accomplice require corroboration under section 634.04.

**III.    Admissibility of A.C.'s Statements in the Jail Calls and Jail Text Messages**

Steeprock argues that the "primary evidence at [his] trial was the hearsay statements" of A.C., which were "inadmissible because most of those statements were not so against [A.C.'s] penal interest" such that "she would not have made them had they not been true." The state argues that Steeprock forfeited this issue, but if the issue is preserved, the district court did not abuse its discretion by admitting the statements as made against A.C.'s interest.

The Minnesota Rules of Evidence define "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Minn. R. Evid. 801(c). "The use of hearsay evidence generally is prohibited during a trial unless one of several exceptions applies." *State v. Vangrevenhof*, 941 N.W.2d 730, 736 (Minn. 2020); *see* Minn. R. Evid. 802. One of these exceptions is for statements against the declarant's interest. Minn. R. Evid. 804(b)(3).

A district court's analysis of the admissibility of statements against interest in a criminal trial under rule 804(b)(3) follows three steps. *State v. Tovar*, 605 N.W.2d 717, 723 (Minn. 2000). First, "for the statement-against-interest exception to apply, the declarant must be unavailable." *Miles v. State*, 840 N.W.2d 195, 203 (Minn. 2013); *see also* Minn. R. Evid. 804(b). Second, the statement must be

> at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person

34

> in the declarant's position would not have made the statement
> unless believing it to be true.

Minn. R. Evid. 804(b)(3).

Third, courts must "construe the term 'statement' narrowly and allow only those statements that directly inculpate the declarant and not admit a larger narrative that merely contains some inculpating statements." *Tovar*, 605 N.W.2d at 723. "[S]tatements incriminating a third party must be scrutinized carefully to ensure that they are truly against the declarant's penal interest and not attempts to shift blame or curry favor." *State v. Usee*, 800 N.W.2d 192, 199 (Minn. App. 2011) (quotation omitted), *rev. denied* (Minn. Aug. 24, 2011).

We observe that the parties agree that A.C. was an unavailable declarant but disagree about whether the district court abused its discretion on the second and third steps described above. At trial, the state offered into evidence four recorded jail calls involving A.C. and six jail text messages from A.C. Steeprock concedes that the first recorded jail call "was self-incriminating" to A.C., and thus, he challenges only the other three jail calls and the jail text messages.

We decline to discuss the admissibility of the three challenged jail calls and the jail text messages in detail because we have otherwise concluded that Steeprock is entitled to a new trial based on the violation of his constitutional rights in obtaining his saliva sample under rule 9.02. But because it may be helpful on remand, we note that, under rule 804(b)(3), the supreme court has instructed courts to "consider whether each declaration or remark—rather than the narrative or conversation as a whole—is sufficiently against the

35

declarant's interest." *State v. Morales*, 788 N.W.2d 737, 763 (Minn. 2010). The supreme court added that courts must "parse a declarant's generally self-inculpatory narrative to separate and omit from the narrative non-self-inculpatory declarations or remarks." *Id.*; *see Williamson v. United States*, 512 U.S. 594, 600-01 (1994) (stating that the hearsay exception for statements against interest "does not allow admission of non-self-inculpatory statements, even if they are made within a broader narrative that is generally self-inculpatory"). Thus, each of A.C.'s statements—rather than the call or text message as a whole—must be sufficiently against A.C.'s interest to be admissible under rule 804(b)(3).

## IV. Steeprock's motion to strike parts of the state's supplemental response brief is denied.

Steeprock moves to strike parts of the state's supplemental response brief that was filed in response to his late pro se supplemental brief,[16] arguing that the state improperly made "additional arguments" about the rule 804(b)(3) issues raised in Steeprock's initial brief. Steeprock argues that "other than a brief reference to his trial attorney's argument that [A.C.'s] statements were not 'self-inculpatory'" in his pro se supplemental brief, he "did not raise an issue under Rule 804(b)(3)."[17] The state disagrees, arguing that

---

[16] We note that this court allowed the state to file a supplemental response brief to avoid any prejudice after Steeprock's pro se supplemental brief was filed late.

[17] Many of Steeprock's arguments in his pro se supplemental brief reiterate those raised by his attorney in the initial brief, and none of Steeprock's additional arguments provide a basis for relief. Steeprock argues that the district court erred by granting the state's motion to obtain Steeprock's saliva sample under rule 9.02, subdivision 2(1)(f), because "the state agreed not to use" the DNA evidence from the pretrial search warrant. This argument is unsupported by legal analysis or citation, and thus, we decline to address it. *See Ganguli v. Univ. of Minn.*, 512 N.W.2d 918, 919 n.1 (Minn. App. 1994). Steeprock also argues that the statements by A.C. and brother during the recorded jail calls were "non-testimonial"

36

Steeprock's "pro se supplemental brief raised rule 804(b)(3) as an issue" and that, even if the state made new arguments, they are "allowed," citing *State v. Grunig*, 660 N.W.2d 134 (Minn. 2003).

Because we do not consider the state's arguments in its supplemental response brief, we deny Steeprock's motion to strike as unnecessary. *See Berge v. Comm'r of Pub. Safety*, 588 N.W.2d 177, 180 (Minn. App. 1999) (determining that it was unnecessary to address the merits of the motion to strike because this court did not rely on the objected-to material).

## DECISION

When the state obtained Steeprock's saliva sample pursuant to a court order under Minn. R. Crim. P. 9.02, subd. 2(1)(f), for the express purpose of determining whether Steeprock's DNA matched DNA on a weapon used in the crime charged, the state conducted a search that required a valid warrant. The district court granted the state's rule 9.02 motion and ordered Steeprock to provide a saliva sample, but the state did not obtain a valid search warrant. Thus, we conclude that the state violated Steeprock's constitutional rights and that the exclusionary rule applies; accordingly, the state's DNA evidence derived from Steeprock's saliva sample should have been suppressed. The error in admitting the DNA evidence was not harmless beyond a reasonable doubt, and therefore, Steeprock's conviction is reversed and his case remanded for a new trial.

---

and "violate[] the confrontation clause." Steeprock's argument, however, misconstrues the Confrontation Clause, which prohibits the "admission of *testimonial* statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *State v. Warsame*, 735 N.W.2d 684, 689 (Minn. 2007) (emphasis added) (quoting *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004)).

We also hold that "testimony," as used in Minn. Stat. § 634.04, refers to statements made under oath. The district court therefore did not abuse its discretion by refusing to instruct the jury that A.C.'s out-of-court statements required corroboration, as provided in section 634.04. Next, we need not decide the admissibility of A.C.'s hearsay statements. And finally, we deny Steeprock's motion to strike portions of the state's supplemental response brief.

**Reversed and remanded; motion denied.**